**Eric GADSBY, by his parents and next friends; Carol GADSBY; John Gadsby, Plaintiffs–Appellants,**

**v.**

**Nancy S. GRASMICK, Officially, Superintendent, Maryland State Department of Education; Maryland State Department of Education, Defendants–Appellees.**

No. 96–1292.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 29, 1997.

Decided March 21, 1997.

942

**ARGUED:** Gary P. Peller, Georgetown University Law Center, Washington, D.C., for Appellants. JoAnn Grozuczak Goedert, Assistant Attorney General, Baltimore, MD, for Appellees. **ON BRIEF:** Matthew B. Bogin, Michael J. Eig, Bogin & Eig, P.C., Washington, D.C., for Appellants. J. Joseph Curran, Jr., Attorney General of Maryland, Baltimore, MD, for Appellees.

Before HAMILTON, WILLIAMS, and MICHAEL, Circuit Judges.

Vacated and remanded by published opinion. Judge HAMILTON wrote the opinion, in which Judge WILLIAMS and Judge MICHAEL joined.

## OPINION

HAMILTON, Circuit Judge:

Eric Gadsby and his parents, Carol and John Gadsby, appeal the district court's adverse judgment against them. In their complaint, the Gadsbys allege that the Maryland State Department of Education (MSDE) violated the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400–1485, and should be held liable for the costs of Eric's private school placement for the 1993–94 school year. Because the district court incorrectly held that the Gadsbys had no potentially valid cause of action against MSDE, we vacate its judgment in favor of MSDE and remand for further proceedings consistent with this opinion.

### I.

Because this appeal involves both IDEA and various State statutory and administrative provisions, it is helpful to begin our discussion with an overview of the relevant code provisions before reviewing the particular facts of this dispute.

### A.

IDEA, known originally as the Education of the Handicapped Act,[1] was enacted to ensure that all children with disabilities have access to a "free appropriate public education" to meet their unique needs. 20 U.S.C. § 1400(c). A "free appropriate public education" is defined as "special education and related services" that (1) have been provided at public expense and under public supervision and direction; (2) meet the standards of the state educational agency; (3) include an appropriate preschool, elementary, or secondary school education in the state involved; and (4) are provided in conformity with the individualized education program required under § 1414(a)(5). *Id.* § 1401(a)(18).

To effectuate this goal, Congress established a three-tiered funding, administration, and implementation scheme, under which the state must submit a plan of compliance to the Secretary of Education which provides federal IDEA funds to the state. *See* 20 U.S.C. §§ 1412–1414. The state is then responsible for administering the funds on the state lev-

---

1. Title of the Act was changed from the "Education of the Handicapped Act" to the "Individuals with Disabilities Education Act" in 1990. Education of the Handicapped Act Amendments of 1990, Pub.L. No. 101–476, § 901(a)(1), 104 Stat. 1103, 1141–42 (1991). Because numerous cases interpreting the Act were decided prior to 1990, they refer to the Education of the Handicapped Act. Since the Education of the Handicapped Act and IDEA are the same legislative act, however, we will refer only to IDEA, even when discussing cases that interpreted the Act before its title was changed by the 1990 amendments.

el, including the distribution of federal funds to local education agencies (LEAs) and the implementation of policies and procedures to ensure that each LEA expends the funds in a manner consistent with the purpose and substantive provisions of IDEA. *See id.* §§ 1413(a), 1414(b). In order to qualify for IDEA funds, each LEA must apply to the state education agency (SEA) and provide certain assurances of compliance with IDEA. *See id.* § 1414(a). The LEA then provides services directly to children with disabilities using the funds obtained from the SEA. *See id.*

A state wishing to receive funding under IDEA must have in effect a policy assuring all children with disabilities a free appropriate public education and establish specific procedures to ensure compliance with IDEA by both state and local education agencies. *See id.* § 1412. More specifically, each state must submit a state plan to the Secretary of Education setting forth, *inter alia:* (1) policies and procedures for ensuring that funds received under IDEA are expended in accordance with its provisions, *see id.* § 1413(a)(1)–(2); (2) a description of programs and procedures for personnel development, *see id.* § 1413(a)(3); (3) policies and procedures to provide for the participation of children in private schools in programs established under IDEA and to provide special education services to children in private schools who are referred to the state for educational services, *see id.* § 1413(a)(4); and (4) procedures for the annual evaluation of the effectiveness of state programs under IDEA, *see id.* § 1413(a)(11). Of particular import to this litigation is IDEA's directive to the states to establish policies and procedures for developing and implementing interagency agreements between the SEA and other state and local agencies to define the financial responsibility of each agency for the provision of a free appropriate public education to each child with a disability and to resolve interagency disputes. *See id.* § 1413(a)(13).

The LEA, on the other hand, must apply to the state for funds under IDEA. *See* 20 U.S.C. § 1414(a). Section 1414(a) provides that in its application, the LEA must, among other things: (1) provide assurances to the state that payments will be used to pay costs directly attributable to programs implementing the provisions of IDEA, *see id.* § 1414(a)(1); (2) maintain records and furnish information as may be necessary for the state to perform its duties under IDEA, *see id.* § 1414(a)(3); and (3) provide assurances to the state that the LEA will establish or revise an individualized education program for each child with a disability at the beginning of each school year and review its provisions at least annually, *see id.* § 1414(a)(5). In the event that an LEA has no program for a free appropriate public education in place or fails to maintain an existing program, § 1414(d)(1) provides a stopgap measure, ensuring the provision of a free appropriate public education:

> Whenever ... a[n] [LEA] ... is unable or unwilling to establish and maintain programs of free appropriate public education which meet the requirements established in subsection (a) ... the [SEA] shall use the payments which would have been available to such [LEA] to provide special education and related services directly to handicapped children residing in the area served by such [LEA].

*Id.* § 1414(d)(1).

Thus, IDEA delegates supervisory authority to the SEA, which is responsible for administering funds, setting up policies and procedures to ensure local compliance with IDEA, and filling in for the LEA by providing services directly to students in need where the LEA is either unable or unwilling to establish and maintain programs in compliance with IDEA. The LEA, on the other hand, is responsible for the direct provision of services under IDEA, including the development of an individualized education program (IEP) for each disabled student, the expenditure of IDEA funds to establish programs in compliance with IDEA, and the maintenance of records and the supply of information to the SEA as needed to enable the SEA to function effectively in its supervisory role under IDEA.

Although the SEA's role under IDEA is primarily supervisory, § 1412(6) places the ultimate responsibility for the provision of a

free appropriate public education to each student on the SEA:

> The State educational agency shall be responsible for assuring that the requirements of this subchapter are carried out and that all educational programs for handicapped children within the State, including all such programs administered by any other State or local agency, will be under the general supervision of the persons responsible for educational programs for handicapped children in the State educational agency and shall meet education standards of the State educational agency. This paragraph shall not be construed to limit the responsibility of agencies other than educational agencies in a State from providing or paying for some or all of the costs of a free appropriate public education to be provided handicapped children in the State.

20 U.S.C. § 1412(6). In addition, the legislative history indicates that § 1412(6) was included in the statute to "assure a single line of responsibility with regard to the education of handicapped children." S. REP. NO. 94-168, at 24 (1975). This report states further that while different agencies may deliver services under IDEA, "the responsibility must remain in a central agency overseeing the education of handicapped children, so that failure to deliver services or the violation of the rights of handicapped children is squarely the responsibility of one agency." *Id.*

In addition to its substantive provisions, IDEA also contains a comprehensive set of procedural safeguards to ensure that the parents or guardian of a handicapped child are notified of decisions affecting their child and have an opportunity to contest these decisions. *See* 20 U.S.C. § 1415. Under the procedural provisions of IDEA, any SEA or LEA which receives assistance under IDEA must establish and maintain such procedural safeguards. *See id.* § 1415(a). These safeguards include the right of parents to examine all relevant records with regard to the education of their child, *see id.* § 1415(b)(1)(A); the right to obtain an independent educational evaluation of the child, *see id.*; written prior notice to the parents whenever an agency proposes or refuses to initiate or change the identification, evaluation, or educational placement of the child or the provision of a free appropriate public education to the child, *see id.* § 1415(b)(1)(C); and the opportunity to present complaints with respect to the provision of a free appropriate public education to the child, *see id.* § 1415(b)(1)(E). Once a complaint is received under § 1415(b)(1), the parents have a right to an impartial due process hearing conducted by either the SEA or the LEA. *See id.* § 1415(b)(2). If this hearing is conducted by the LEA, any party aggrieved by the findings and decision may appeal to the SEA which must conduct an impartial review of the hearing and make an independent decision. *See id.* § 1415(c). In addition, at either of these hearings, the parties have the right to be accompanied by counsel, the right to present evidence, the right to a transcript of the hearing, and the right to written findings of fact and decisions. *See id.* § 1415(d). Finally, any party aggrieved by the decision of the SEA following a hearing under either § 1415(b)(2) or § 1415(c) may file a complaint in a United States district court, and the court "shall grant such relief as the court determines is appropriate." *See id.* § 1415(e).

The State of Maryland has enacted several statutory and administrative code provisions concerning the provision of educational services to children with disabilities within the State. Section 8–409 of the Maryland Code for Education provides, for example, that "[a] child who needs special educational services that are not provided in a public county, regional, or State program shall be placed in an appropriate nonpublic educational program that offers these services." MD. CODE ANN., EDUC. § 8–409(a)(1) (1996). Section 8–409 states further that the costs of a private educational program shall be paid in accordance with the provisions of § 8–417.2(d) or § 8–417.3(d), as appropriate. *Id.* § 8–409(b). However, § 8–409(c)(1) qualifies the availability of funds for private educational services by stating that payment or reimbursement for a private program may not be provided unless MSDE approves: (1) the private program; (2) the placement of the child in the program; (3) the cost of the program; and (4) the amount of payment or

reimbursement. *Id.* § 8–409(c)(1); *see also* MD. REGS. CODE tit. 13A, § 05.01.12(D)(1) (1996). MSDE approval is not required, however, if the LEA approves of the placement and pays the cost of the private placement without a contribution from MSDE. MD. CODE ANN., EDUC. § 8–409(c)(2).

In addition to the approval requirements noted above, an LEA seeking funds for an out-of-state private placement must show that the out-of-state placement is closer in distance to the child's home than an alternative in-state placement and that an equally appropriate individualized in-state program is not available for the child for the average cost of appropriate out-of-state programs. MD. ANN. CODE art. 49D, § 20.1 (Supp.1996). Additionally, requests for an out-of-state private placement must first be referred to the Local Coordinating Council (LCC), a local interagency committee responsible for the coordination of services to children. *See id.* § 19 (LCC must accept placement referrals and decide what type of placement is needed for a child with disabilities). If the LCC recommends an out-of-state private placement for a child, final State funding approval is authorized by the State Coordinating Council (SCC), an interagency committee representing State agencies serving children. *See id.* § 16. If funding for a private out-of-state placement is approved by the State, the portion which the LEA and SEA must contribute, respectively, is determined by Maryland Code § 8–417.3. *See* MD. CODE ANN.,EDUC. § 8–417.3.

Similar to IDEA, Title 13A of the Code of Maryland Regulations also contains procedural safeguards to ensure notice and an opportunity for parents of a child with a disability to appeal decisions affecting the child's educational program. Section 05.01.13 provides that parents shall be provided prior written notice of a decision to propose or refuse to initiate or change the educational placement of a student and that the notice shall give a full explanation of all procedural safeguards available to parents under IDEA. *See* MD. REGS. CODE tit. 13A, §§ 05.01.13(B), (C). In addition, § 05.01.14 provides for a local due process hearing concerning the educational placement of any stu-

dent or the provision of a free appropriate public education to the student and establishes hearing procedures to ensure the effective participation of the child's parents. *See id.* § 05.01.14. Finally, § 05.01.15 provides for an opportunity to appeal to the State Hearing Review Board where local procedures have been exhausted. *See id.* § 05.01.15.

**B.**

Eric Gadsby, a seventeen-year-old with learning disabilities, is a resident of the City of Baltimore. Although Eric attended a private day school through the eighth grade, in May 1993, Eric and his parents requested that the Baltimore City Public Schools (BCPS) evaluate Eric for special education services. By the beginning of the 1993–94 school year, however, BCPS had failed to develop an individualized education program (IEP) for Eric, as required by IDEA, *see* 20 U.S.C. §§ 1401(a)(18)(D), 1414(a)(5), and the Gadsbys enrolled Eric in the Forman School, a private residential school in Connecticut.

BCPS developed its first IEP for Eric on October 13, 1993. Under the IEP proposed by BCPS, Eric would attend regular public school classes for twenty hours a week and receive ten hours of special education services a week.

In November 1993, the Gadsbys challenged the proposed IEP and requested a local due process hearing. *See* MD. REGS. CODE tit. 13A, § 05.01.14(A). The hearing was subsequently scheduled for February 24, 1994.

Prior to the hearing, the Gadsbys and BCPS agreed to settle their dispute. Under the terms of their settlement, BCPS agreed to pay the portion of Eric's tuition at the Forman School that the LEA is required to pay under Maryland's Education Code § 8–417.3, and the Gadsbys agreed not to proceed with the local due process hearing. *See* MD. CODE ANN., EDUC. § 8–417.3. BCPS also agreed to apply to MSDE for "its approval and contribution for the remainder of the tuition." (J.A. 60). Finally, BCPS agreed to "stay neutral" if there was a dispute between the Gadsbys and MSDE or either of the

coordinating councils. *Id.* At no time prior to the hearing request or during the course of settlement negotiations was MSDE made aware of the Gadsbys' situation.

On April 19, 1994, BCPS submitted Eric's application for State funding to MSDE. MSDE officials determined that the BCPS application contained serious deficiencies preventing its consideration. Therefore, on May 9, 1994, MSDE returned the application without decision, giving two specific reasons: (1) the State statute providing for reimbursement of private tuition by MSDE did not apply because a settlement had been reached between BCPS and the Gadsbys concerning the financial responsibility of each party for Eric's Forman School placement; and (2) prior approval by both the LCC and the SCC was required for all out-of-state residential placements, *see* MD. ANN. CODE art. 49D, §§ 16, 19 (1994) (setting up procedure whereby LCC accepts referrals for residential placements for children with disabilities from local agencies and recommends placement to SCC which in turn reviews recommendation). MSDE specifically referred BCPS to a May 1992 directive from Nancy Grasmick, State Superintendent of Schools, in which Ms. Grasmick stated that MSDE would not accept applications for approval of placements in unapproved programs. Instead, according to MSDE's letter to BCPS, an LEA that enters into an agreement concerning the placement of a child in an unapproved program may have to bear the full cost of such a placement. In its letter to BCPS explaining its position, MSDE stated that either BCPS should submit its application for approval of Eric's out-of-state residential placement to the LCC, as required for approval of an out-of-state residential placement, *see* MD. ANN. CODE art. 49D, § 19 (1994) (LCC will accept referrals for the residential placement of children with disabilities from local school board), or the parents could take the matter to a local level hearing, *see* MD. REGS. CODE, tit. 13A, § 05.01.14.

MSDE did not send a copy of the May 9 letter to the Gadsbys or otherwise notify the Gadsbys of its refusal to consider BCPS's application on behalf of Eric. However, on May 23, 1994, counsel for BCPS sent a copy of the letter to the Gadsbys' counsel.

Following the return of its application from MSDE, BCPS submitted its application to the LCC. On June 17, 1994, the LCC held a meeting to consider the application. Although the Gadsbys had been informed of the meeting and invited to attend, they did not attend. The LCC rejected the application, finding that based on BCPS's description of Eric's needs, he did not need the level of care provided by a residential treatment center and, therefore, was not eligible for a residential placement.

On September 26, 1994, the Gadsbys filed an administrative appeal under IDEA, challenging MSDE's return of BCPS's tuition reimbursement application. *See* 20 U.S.C. § 1415(c); MD. REGS. CODE § 05.01.15(A). A three-member Maryland State Department of Education Hearing Review Board (Board) convened to consider the Gadsbys' appeal. *See id.* § 05.01.14. Because MSDE argued that the dispute was not ripe for a State hearing and that it was not a proper party to the appeal, the Board first held a pre-hearing conference on October 13, 1994.

At the pre-hearing conference, MSDE argued that because BCPS's application on behalf of Eric had not been through the appropriate intra-agency review process before being submitted to MSDE, it refused to consider the application but had not rejected the application. Because the application had not been denied, MSDE argued that the dispute was not ripe for a State hearing. The Gadsbys, however, argued that MSDE's refusal to consider Eric's application was tantamount to a denial, giving the Board jurisdiction.

In addition to its argument that the dispute was not ripe for a Board hearing, MSDE also argued that it was not a proper party to the appeal for two reasons. First, MSDE argued that it was not a party to the dispute because it had made no final decision with respect to BCPS's application on behalf of Eric. Second, MSDE argued that it was not a party to the February 1994 settlement agreement between BCPS and the Gadsbys and, therefore, it was not obligated to contribute to Eric's Forman tuition or to even

rule on Eric's application because the application was not properly before it.

The Board concluded that because BCPS had settled its dispute with the Gadsbys, it was not a proper party to the appeal. The Board ruled, however, that MSDE's May 9 letter to BCPS returning its application on behalf of Eric constituted a denial of that application. Specifically, the Board relied on MSDE's unequivocal statement in its letter that prior approval of an out-of-state residential placement was required by both the LCC and the SCC before MSDE could approve a funding request. In addition, the Board noted MSDE's reference to Ms. Grasmick's May 1992 directive, in which she stated:

> [S]hould LEA officials enter into any agreement, formal or otherwise, with a parent or parent's counsel concerning the placement of a student in an unapproved program or in a placement that does not conform to [requisite state procedures], that LEA may not rely on MSDE for any share of the funding. . . .

(J.A. 67–68). Because the Gadsbys made a unilateral placement of Eric at the Forman School, a private, out-of-state placement that had not been approved by MSDE, the Board found that MSDE's letter to BCPS had effectively denied Eric's application.

Following the pre-hearing conference, a hearing before the Board was scheduled for November 7, 1994. On October 31, 1994, the parties submitted the following stipulated facts:

(1) Eric Gadsby was placed at the Forman School unilaterally by his parents in September 1993.

(2) After the Gadsbys requested that Eric be screened by BCPS in May 1993, BCPS committed serious procedural violations in its development of Eric's individualized education program (IEP), which deprived Eric of any public educational opportunities for the 1993–94 school year.

(3) Until BCPS submitted an application for State funding of Eric's 1993–94 Forman School placement in April 1994, the Maryland State Department of Education (MSDE) had never been informed of any issue concerning Eric's educational program, nor had MSDE been consulted as to the terms of the settlement agreement reached by BCPS and the Gadsbys in February 1994.

(4) BCPS failed to meet State statutory conditions for obtaining State funding of Eric's out-of-state residential placement in submitting the funding application to MSDE in April 1994.

(5) Eric received educational benefits at the Forman School during the 1993–94 school year.

(6) The Forman School is not approved for State special education funding and has not been found by MSDE to meet State and federal special education standards or otherwise provide an appropriate education to students with disabilities, as defined by federal and State special education statutes and regulations.

These facts were read into the record at the Board hearing held on November 7, 1994.[2]

The Board issued its decision on January 6, 1995. The first issue it considered was whether IDEA applied to the dispute. At the hearing, MSDE first argued that IDEA did not apply to the dispute because the dispute was between an LEA and an SEA regarding the SEA's decision to fund or not to fund a particular out-of-state placement. According to MSDE, IDEA does not require an SEA to reimburse an LEA for a private school placement, and, therefore, IDEA should not even apply. The Board concluded that IDEA applied to the dispute, however, because, ultimately, the dispute concerned the deprivation of a public educational opportunity for Eric and the funding of that education, matters clearly encompassed by IDEA.

Having determined that the provisions of IDEA applied to the dispute, the Board next considered whether MSDE had complied

---

**2.** Because the parties stipulated to the material facts of their dispute, no other evidence was taken at the November 7 hearing.

with the statutory notice requirements under IDEA when it returned BCPS's application concerning reimbursement for Eric's private school tuition. *See* 20 U.S.C. § 1415(b)(1)(C) (requiring written prior notice to parents or guardian of child with disability when agency proposes to change, or refuses to change, identification, evaluation, or educational placement of child or provision of free appropriate public education); *see also* 34 C.F.R. §§ 300.504, 300.505 (1994) (detailing IDEA notice requirements). The Gadsbys argued that MSDE had failed to comply with IDEA's notice requirement when it returned BCPS's application on behalf of Eric without providing any notice of its decision to the Gadsbys. The Board found that at the time that MSDE returned BCPS's application on behalf of Eric, it had sufficient information upon which to base its refusal to consider the application and to provide the Gadsbys with an explanation supporting its action. Because MSDE had failed to give the Gadsbys any notice of the denial, the Board concluded that MSDE had violated the notice provisions of IDEA. The Board found that MSDE's procedural violations effectively denied Eric a free appropriate public education under IDEA and, therefore, MSDE was responsible for its portion of Eric's private school placement. *See* 20 U.S.C. § 1412(1) (requiring state to have policy in effect assuring all children with disabilities the right of a free appropriate public education); MD. CODE ANN., EDUC. § 8–417.3 (1996) (establishing formula for determining State and county shares of cost of educating children with disabilities).

On March 29, 1995, the Gadsbys filed suit against Walter G. Amprey, Superintendent of BCPS; Nancy S. Grasmick, MSDE Superintendent; and MSDE in the United States District Court for the District of Maryland, seeking to enforce the Board's decision. On April 21, 1995, Amprey filed a motion to dismiss, asserting that BCPS had fulfilled its obligations under the settlement agreement and that it was not a party to the proceeding before the Board. On April 24, 1995, MSDE and Grasmick filed an answer and counterclaim, seeking to reverse the Board's decision and dismissal of the complaint.

On August 2, 1995, the district court entered its opinion and order granting Amprey's motion to dismiss and reversing and vacating the Board's decision. The district court stated that because there was no dispute as to any material fact regarding either the complaint or the counterclaim, it would resolve Amprey's motion to dismiss, as well as the merits of the dispute.

The district court first recognized that, under IDEA, BCPS was obligated to provide Eric with a free appropriate public education. The district court noted that under IDEA, if parents and the LEA disagree about the services a child needs, there is an elaborate set of administrative and judicial review procedures which exist under federal and State law. In this case, the district court noted that the Gadsbys and BCPS decided not to pursue this review process, but rather they resolved their dispute privately. The district court found that because the Gadsbys settled with BCPS, MSDE was never given the opportunity to evaluate whether Eric was entitled to a residential placement under IDEA. Therefore, MSDE's decision to return the application to BCPS did not relate to whether Eric was entitled to a residential placement under IDEA, but rather related only to whether BCPS could receive a State subsidy for the placement. According to the district court, MSDE's refusal to consider Eric's initial application was merely its insistence that BCPS, like other LEAs, follow statutorily required procedures when asking for State reimbursement for residential placements. The district court concluded the MSDE did not need to inform the Gadsbys of its decision. Therefore, the district court held that the Board was erroneous as a matter of law and that Eric and his parents had no valid cause of action against any defendant. The district court then granted defendant Amprey's motion to dismiss and vacated the Board's decision.

On August 14, 1995, the Gadsbys filed a motion to alter or amend the district court's order pursuant to Federal Rule of Civil Procedure 59(e). In their motion, the Gadsbys argued, *inter alia*, that the district court did not address their facial challenge to Mary-

land's process for approving residential placements for children with disabilities.

On February 6, 1996, the district court entered a second opinion and order denying the Gadsbys' motion to alter or amend its previous order. The district court stated that in their motion the Gadsbys merely reargued matters previously litigated. With regard to the Gadsbys' facial challenge to Maryland's procedural mechanism for approving residential placements, the district court stated that while not explicitly addressed in its previous order, this argument was implicitly rejected. The district court noted that it found in its previous order that MSDE's decision related only to whether BCPS could receive a subsidy from MSDE, not to whether Eric was entitled to a residential placement under IDEA, and concluded, therefore, that IDEA's procedural requirements did not apply to MSDE's refusal to consider Eric's application. According to the district court, it follows from this conclusion that IDEA does not apply to Maryland's procedure for evaluating LEA applications for discretionary State subsidies. Because it had implicitly rejected the Gadsbys' facial challenge to Maryland's process for approving residential placements in its previous order, the district court denied their motion to alter its previous order on this basis.

Also on February 6, 1996, the district court entered its judgment against the Gadsbys, reversing and vacating the Board's decision and dismissing all of the Gadsbys' claims with prejudice. The Gadsbys noted a timely appeal.

## II.

On appeal, the Gadsbys argue that they are entitled to reimbursement for the remainder of Eric's Forman School tuition from MSDE because: (1) the State of Maryland failed to provide Eric a free appropriate public education as required by IDEA; and (2) MSDE violated IDEA's notice provisions when it denied reimbursement for Eric's Forman School tuition without notice to the Gadsbys, thereby violating Eric's right to a

free appropriate public education. After setting forth the appropriate standard of review, we address each argument in turn.

### A.

■ The district court in this case granted defendant Walter G. Amprey's motion to dismiss, ostensibly pursuant to Federal Rule of Civil Procedure 12(b)(6), and rendered judgment in favor of all defendants based on the parties' stipulated facts. At the time that it entered its opinion and order dismissing the Gadsbys' claims against all defendants, only defendant Amprey had filed a motion to dismiss. All parties had briefed the merits of their respective positions, however, and, as stated above, the district court relied on the facts as stipulated for the Board hearing in resolving the dispute. Because the district court considered matters outside of the pleadings, we shall treat its decision as one to grant summary judgment, rather than as one to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6).[3] *See* FED. R. CIV. P. 12(b) (where matters outside the pleadings are presented to court on a motion to dismiss and the court does not exclude those matters, the motion shall be treated as one for summary judgment); *Davis v. Featherstone,* 97 F.3d 734, 735 (4th Cir.1996) (treating motion to dismiss as motion for summary judgment where district court considered matters outside of pleadings).

■ Whether a party is entitled to summary judgment is a matter of law which we review *de novo. Higgins v. E.I. DuPont de Nemours & Co.,* 863 F.2d 1162, 1167 (4th Cir.1988). Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

### B.

As set forth above, IDEA requires states to provide a free appropriate public edu-

---

**3.** On appeal, neither party claims that the district court erred when it considered matters outside of the pleadings, nor does either party argue that it

did not have the opportunity to present its case fully before the district court entered its judgment.

**950**

cation to all of its children with disabilities. *See* 20 U.S.C. § 1412(1). Central to the provision of a free appropriate public education is the development of an IEP by the LEA for each child with a disability within its jurisdiction. *See id.* § 1401(a)(18) (defining "free appropriate public education" as special education and related services provided in conformity with IEP); *School Comm. of Town of Burlington v. Department of Educ.,* 471 U.S. 359, 368, 105 S.Ct. 1996, 2002, 85 L.Ed.2d 385 (1985) (describing IEP as "modus operandi" of IDEA).

There is no dispute in this case that the LEA failed to develop an IEP for Eric Gadsby prior to the beginning of the 1993–94 school year, thus violating IDEA. *See* 20 U.S.C. § 1414(a)(5) (requiring LEA to ensure that IEP will be developed or revised for each child at the beginning of each school year). The dispute, rather, revolves around the remedy for the violation.

### 1.

IDEA provides a civil cause of action for parents who disagree with a decision rendered by an SEA and specifically authorizes the district court to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e). The statute does not explicitly state, therefore, what remedies are available to parents whose children have been denied a free appropriate public education, nor does the statute specify what entity shall be responsible for actually remedying the violation.

In *Burlington,* the Supreme Court held that a district court's authority to "grant such relief as the court determines is appropriate," *see* 20 U.S.C. § 1415(e), encompasses the authority to order school authorities "to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the [IDEA]." *Burlington,* 471 U.S. at 369, 105 S.Ct. at 2002. The Court found that the statutory language contained in § 1415(e) confers broad discretion on the district court and noted that IDEA contemplates the possibility that a child would be placed in a private school at public expense where a regular

public school could not meet his or her needs. *Id.* at 370, 105 S.Ct. at 2002–2003. The Court additionally noted that parents who disagree with a proposed IEP prior to the beginning of a school year must either go along with the IEP to the detriment of their child if the placement is, in fact, inappropriate or pay for what they consider to be the appropriate placement. *Id.* The Court reasoned that to deny such parents reimbursement of the costs of that private education where it is subsequently determined that the proposed IEP was inappropriate would mean that "the child's right to a *free* appropriate public education, the parents' right to participate fully in developing a proper IEP, and all of the procedural safeguards [were] less than complete." *Id.* Therefore, the Court concluded that retroactive reimbursement of private placement costs is an available remedy under IDEA. *Id.*

The Supreme Court again addressed the availability of this remedy in *Florence County Sch. Dist. Four v. Carter,* 510 U.S. 7, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993). In *Carter,* the Court held that where the local school district's proposed IEP is inappropriate and parents have unilaterally placed their child in a private placement, the private school's failure to provide a "free appropriate public education" as defined in § 1401(a)(18) does not preclude a court from nevertheless ordering the school district to reimburse the parents for the costs of the private education. *See id.* at 13–14, 114 S.Ct. at 364–66. The Court noted that § 1401(a)(18) requires that the education be provided at public expense and under public supervision and direction and that an IEP be designed by a representative of the LEA. *See id.* at 13, 114 S.Ct. at 365; 20 U.S.C. §§ 1401(a)(18)(A), 1401(a)(18)(D), 1401(a)(20). Since these requirements cannot be met by a private school, the Court concluded that to read § 1401(a)(18) as applying to parental placements "would effectively eliminate the right of unilateral withdrawal recognized in *Burlington.*" *Carter,* 510 U.S. at 13, 114 S.Ct. at 365. This result, concluded the Court, would defeat the statutory purpose of ensuring that children with disabilities receive an education that is both appropriate and free. *See id.*

The *Carter* Court also held that a private school's failure to meet state education standards does not necessarily bar equitable reimbursement ordered by a district court. *Id.* at 14, 114 S.Ct. at 365–66. In *Carter,* the school district argued that reimbursement was not proper because the private program to which the parents sent the child had not been approved by the state. *See id.* The Court held, however, that the parents' failure to select a program known to be approved by the state in favor of a program that had not been approved is not itself a bar to court-ordered reimbursement. *See id.*

Finally, the *Carter* Court rejected the school district's argument that permitting reimbursement for parents places an unreasonable burden on financially strapped LEAs:

> There is no doubt that Congress has imposed a significant financial burden on States and school districts that participate in IDEA. Yet public educational authorities who want to avoid reimbursing parents for the private education of a disabled child can do one of two things: give the child a free appropriate public education in a public setting, or place the child in an appropriate private setting of the State's choice. This is IDEA's mandate, and school officials who conform to it need not worry about reimbursement claims.

*Carter,* 510 U.S. at 15, 114 S.Ct. at 366.

■ These decisions make clear that the remedy ordered by the Board in this case—reimbursement of Eric's private school tuition—is an appropriate remedy under IDEA where the LEA fails to develop an appropriate IEP by the beginning of the school year. The Gadsbys assert, however, not only that they are entitled to reimbursement for the costs of Eric's Forman School tuition, but also that MSDE[4] must pay the portion of the reimbursement funds that the LEA did not pay pursuant to their settlement. The Gadsbys assert, first, that MSDE is ultimately responsible under IDEA for the provision of a free appropriate public education to all students with disabilities in the State of Maryland. Second, the Gadsbys assert that under State law MSDE is required to contrib-

ute a portion of the reimbursement costs. *See* MD. CODE ANN., EDUC. § 8–417.3.

MSDE responds, however, that its duty to contribute to the reimbursement of a student's private school tuition depends on the LEA's compliance with State law. MSDE argues that because the application for reimbursement came from the LEA and the LEA failed to comply with MSDE requirements, it had no obligation to grant the LEA's application for reimbursement on Eric's behalf. *See* MD. CODE ANN., EDUC. § 8–409(c)(1) (funds for private educational services are not available from MSDE unless MSDE approves private program and costs); MD. ANN. CODE art. 49D, §§ 16, 19 (Supp.1996) (setting forth procedures for approval of out-of-state private special education placements). According to MSDE, because the LEA violated IDEA in this case, the parents must assert their claim for reimbursement against the LEA, not the SEA. Thus, MSDE argues that where the parents have settled with the LEA, they cannot turn to the SEA for the remainder of the tuition.

The first issue in this case, then, is whether the Gadsbys may assert a cause of action against MSDE for reimbursement of the cost of Eric's tuition at the Forman School based on BCPS's failure to develop an appropriate IEP for Eric, where: (1) BCPS's application on behalf of Eric failed to comply with State law requirements for the approval of an out-of-state private placement; and (2) the Gadsbys have already settled with the LEA, *i.e.,* BCPS, for a portion of these costs and released BCPS from any further liability. In resolving this issue, our first task is to determine whether an SEA may ever be held liable for the failure to provide a free appropriate public education to a child with a disability within its jurisdiction. If we determine that an SEA may be held liable, our next task is to determine the impact of Maryland's laws and regulations on an MSDE's potential liability—that is, whether MSDE may avoid liability for reimbursement costs otherwise appropriate under *Burlington* and *Carter* by arguing that BCPS failed to comply with Maryland's laws and regulations

---

**4.** Although the Gadsbys filed suit against three defendants, both parties routinely refer only to

MSDE in their briefs. Therefore, throughout this opinion we will refer only to MSDE.

established to comply with IDEA. Finally, as between the LEA and the SEA, we must decide under what circumstances an SEA may be held liable for the reimbursement costs of a child's private school tuition, where the parents or guardians of the child are entitled to reimbursement under *Burlington* and *Carter.*

### 2.

The first question we must address to resolve the issue of MSDE's liability for the failure to develop an IEP for Eric is whether an SEA may ever be held liable where there is a failure to provide a free appropriate public education to a particular child within its jurisdiction. Because this question is one of statutory interpretation, we will begin our analysis by reviewing some of the well-settled rules of statutory interpretation.

■ When interpreting a statute, "[w]e begin ... by examining the statutory language." *United States v. Murphy,* 35 F.3d 143, 145 (4th Cir.1994). If the statutory language is unambiguous and within the constitutional authority of the legislature that enacted it, " 'the sole function of the courts is to enforce it according to its terms.' " *Id.* (quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917)).

■ When statutory language is ambiguous or does not directly answer the question presented, however, we look "to some other source of legislative intent." *United States v. Southern Management Corp.,* 955 F.2d 914, 920 (4th Cir.1992). As the Supreme Court has stated, "we begin ... in any exercise of statutory construction with the text of the provision in question, and move on, as need be, to the structure and purpose of the Act in which it occurs." *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, ——, 115 S.Ct. 1671, 1677, 131 L.Ed.2d 695 (1995); *see also O'Connell v. Shalala,* 79 F.3d 170, 176 (1st Cir.1996) ("[A] court engaged in the task of statutory interpretation must examine the statute as a whole, giving due weight to design, structure, and purpose as well as to aggregate language."); *Spencer v. Brown,* 17 F.3d 368, 372 (Fed.Cir.1994)

(when interpreting a statute, "we look not only to the relevant statutory language, but to the design of the statute as a whole and to its object and policy"); *Andrews Univ. v. Merchant (In re Merchant),* 958 F.2d 738, 739 (6th Cir.1992) ("To ascertain the Congressional intent we review the language of the statute together with the design and policy underlying the overall statutory scheme."). Where statutory language is ambiguous, we may also look to legislative history for guidance as to legislative intent. *See Southern Management Corp.,* 955 F.2d at 920–21. Ultimately, "[s]tatutory construction 'is a holistic endeavor,' ... and, at a minimum, must account for a statute's full text, language as well as punctuation, structure, and subject matter." *United States Nat'l Bank of Or. v. Independent Ins. Agents of Am., Inc.,* 508 U.S. 439, 455, 113 S.Ct. 2173, 2182–83, 124 L.Ed.2d 402 (1993) (citation omitted).

### 3.

■ In answering the first question, whether an SEA may be held responsible for the failure to provide a particular child with a free appropriate public education, "[w]e begin, as we must, by examining the statutory language." *Murphy,* 35 F.3d at 145. As noted above, IDEA's remedial provisions do not explicitly state what governmental entity shall be responsible for remedying a particular violation. Instead, § 1415(e) gives the district court broad authority to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e); *see also Burlington,* 471 U.S. at 369, 105 S.Ct. at 2002 (recognizing that this language confers "broad discretion" on district court). However, § 1412(6) states that "[t]he State educational agency shall be responsible for assuring that the requirements of this subchapter are carried out." 20 U.S.C. § 1412(6). This language suggests that, ultimately, it is the SEA's responsibility to ensure that each child within its jurisdiction is provided a free appropriate public education. Therefore, it seems clear that an SEA may be held responsible if it fails to comply with its duty to assure that IDEA's substantive requirements are implemented.

This conclusion is further supported by § 1414(d)(1), which provides that where an LEA is either unable or unwilling to establish and maintain programs for the provision of a free appropriate public education, "the [SEA] shall use the payments which would have been available to such [LEA] to provide special education and related services directly to handicapped children residing in the area served by such [LEA]." 20 U.S.C. § 1414(d)(1). Under this provision, once an LEA is either unable or unwilling to establish and maintain programs in compliance with IDEA, the SEA is responsible for directly providing the services to disabled children in the area. *See Todd D. by Robert D. v. Andrews,* 933 F.2d 1576, 1583 (11th Cir. 1991) (holding that SEA must take responsibility for providing free appropriate public education where disabled student is better served by regional or state facility than local one); *Kruelle v. New Castle County Sch. Dist.,* 642 F.2d 687, 696–98 (3d Cir.1981) (upholding district court's order requiring SEA to provide student with full-time residential program where LEA failed to provide adequate program). It follows, therefore, that the SEA in such a case could be held liable if it fails to provide those services.

Our conclusion that an SEA may be held liable under IDEA where the state fails to provide a free appropriate public education to a child with a disability is buttressed by the legislative history of § 1412(6). This legislative history indicates that § 1412(6) was included in the statute to "assure a single line of responsibility with regard to the education of handicapped children." S. REP. NO. 94–168, at 24 (1975). Therefore, we hold that the SEA is ultimately responsible for the provision of a free appropriate public edu-

cation to all of its students and may be held liable for the state's failure to assure compliance with IDEA.

### 4.

Having held that an SEA may be held liable under IDEA for the failure to provide a free appropriate public education, the next question we must address is whether MSDE may avoid liability for reimbursement costs otherwise appropriate under *Burlington* and *Carter* on the basis that BCPS failed to comply with Maryland State laws and regulations enacted in compliance with IDEA. In particular, MSDE objects to BCPS's failure to obtain approval for Eric's placement from either the LCC or the SCC before applying to MSDE for reimbursement of Eric's Forman School tuition. *See* MD. CODE ANN., EDUC. 8–409(c)(1); MD. ANN. CODE art. 49D §§ 16, 19.

As noted above, § 1413 of IDEA requires SEAs to establish policies and procedures for the administration of funds to LEAs and to ensure that those funds are expended in accordance with IDEA's provisions. *See* 20 U.S.C. §§ 1413(a)(1), 1413(a)(2). In addition, § 1413(a)(13) specifically directs SEAs to establish policies and procedures for developing and implementing interagency agreements between the SEA and other state and local agencies to define the financial responsibility of each agency and to resolve interagency disputes. *See id.* § 1413(a)(13).

 The State of Maryland, then, is not only permitted to regulate IDEA funds in such a way as to ensure that they are expended in compliance with IDEA, but they are required to do so.[5] The question here,

---

**5.** In addition to their argument that MSDE is liable for reimbursement costs of Eric's Forman School tuition because it failed to provide Eric with a free appropriate public education, the Gadsbys also argue that Maryland's interagency review process for out-of-state residential placements violates IDEA by causing undue delay in the implementation of a child's proposed IEP. As support, the Gadsbys cite *Evans v. Evans,* 818 F.Supp. 1215 (N.D.Ind.1993), in which the court held that the State of Indiana's process for approving proposed IEPs involving the residential placement of children under IDEA violated IDEA because of its consequential delays in the implementation of the proposed IEP. *See id.* at 1223.

The *Evans* court, however, noted that Indiana's review process resulted in average delays of 160 to 200 days from the date of the development of the IEP and, thus, violated 34 C.F.R. § 300.342(b)(2), which requires that the IEP be implemented "as soon as possible" following the development, review, or revision of the child's IEP. *See* 34 C.F.R. §§ 300.342(b)(2), 300.343(a). The Gadsbys have submitted no evidence of delays caused by Maryland's interagency review process for out-of-state residential placements, nor did this process interfere with the implementation of Eric's IEP because there was never a proposed IEP for Eric recommending an out-of-

however, is whether MSDE may avoid liability for a portion of Eric Gadsby's tuition costs because BCPS failed to comply with Maryland's laws and regulations governing reimbursement of private school tuition under IDEA. As noted above, in *Carter*, the Supreme Court held that the parents' failure in that case to select a private program that had been approved by the State was not itself a bar to the parents' bid for reimbursement. *See Carter*, 510 U.S. at 14, 114 S.Ct. at 365–66. According to the Court, it would be ironic to forbid parents from educating their child at a private school that provides an appropriate education simply because that school had not been approved by the state school system that failed to provide a free appropriate public education in the first place. *Id.*

By definition, the unilateral placement of a child in an out-of-state private program by a parent does not comply with Maryland's approval requirements. *See* MD. CODE ANN., EDUC. § 8–409(c); MD. ANN. CODE art. 49D, §§ 16, 19. Nevertheless, under *Carter*, if the Gadsbys meet the requirements for reimbursement of private school tuition under *Burlington* and *Carter*, neither the Gadsbys' failure nor BCPS's failure to obtain prior approval from MSDE for the placement would automatically bar an award of reimbursement against MSDE.

5.

█ Finally, we address the question of when an SEA, as opposed to an LEA, may be held liable for the reimbursement costs of a child's private school tuition, where the parents or guardians of the child are entitled to reimbursement under *Burlington* and *Carter*. The Gadsbys assert that an SEA may under any circumstance be held liable where a disabled child is not provided with a free appropriate public education and the parents unilaterally place the child in a private program. MSDE argues, however, that because the LEA has the duty to develop an IEP for each child, only the LEA is liable for

reimbursement costs where it fails to fulfill that duty.

Because the remedy of reimbursement for private school tuition is an equitable remedy imposed at the discretion of the district court and held to be appropriate by the Supreme Court in *Burlington* and *Carter*, as noted above, there is no statutory language specifically authorizing such a remedy, much less designating what governmental entity must pay the costs of reimbursement and when. Therefore, we "must examine the statute as a whole, giving due weight to design, structure, and purpose as well as to aggregate language." *O'Connell*, 79 F.3d at 176.

As set forth above, Congress carefully delineated responsibilities under IDEA, delegating specific duties to the SEA and specific duties to the LEA, while placing ultimate responsibility for compliance with the SEA. Within this scheme, the SEA has supervisory authority and is responsible, for example, for administering federal IDEA funds and establishing policies and procedures to ensure local compliance with IDEA. *See* 20 U.S.C. § 1413. To receive federal funds, the SEA must submit a state plan to the Secretary of Education setting forth its programs for compliance with IDEA. *See id.* § 1413(a). By contrast, the LEA applies to the SEA for IDEA funds, and the LEA is responsible for the direct provision of services under IDEA, including the development of an IEP for each disabled student. *See* 20 U.S.C. § 1414. In addition to these provisions designating certain duties as the SEAs and certain duties as the LEAs, Congress included a stop-gap measure, under which the SEA is ultimately responsible for noncompliance with IDEA. *See* 20 U.S.C. § 1414(d)(1).

Congress also included a comprehensive set of procedural safeguards that must be followed by each agency involved in the implementation of IDEA's substantive provisions. *See* 20 U.S.C. § 1415. These safeguards include the parents' right to prior written notice of decisions affecting their child's IEP and the opportunity for a hearing to resolve any complaints parents may have

state residential placement. Because the Gadsbys have failed to show that Maryland's review process for out-of-state residential placements

under IDEA causes undue delays in the implementation of proposed IEPs, their challenge to that process as violative of IDEA must fail.

with regard to such decisions. *See id.* §§ 1415(b)(1), 1415(b)(2), 1415(c).

In contrast to these very specific provisions delineating each agency's responsibilities under IDEA and providing for certain procedural safeguards, IDEA's remedial provision simply provides that the district court has the authority to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). As the Supreme Court has recognized, this language "confers broad discretion on the court." *Burlington,* 471 U.S. at 369, 105 S.Ct. at 2002.

There is nothing in either the language or the structure of IDEA that limits the district court's authority to award reimbursement costs against the SEA, the LEA, or both in any particular case. By contrast, both the language and the structure of IDEA suggest that either or both entities may be held liable for the failure to provide a free appropriate public education, as the district court deems appropriate after considering all relevant factors. *See Carter,* 510 U.S. at 16, 114 S.Ct. at 366 ("Courts fashioning discretionary equitable relief under IDEA must consider all relevant factors. . . .").

■ One relevant factor to be considered by the district court in fashioning relief is the relative responsibility of each agency for the ultimate failure to provide a child with a free appropriate public education. It may well be the case that in some instances it would be unfair to hold the SEA liable for reimbursement costs of private school tuition, where the LEA was primarily responsible for the failure. On the other hand, there may be cases in which it would be unfair to hold the LEA liable for costs, where, for example, there was no appropriate facility within the LEA's jurisdiction for the child and the SEA failed to provide an alternative.

■ Another relevant factor that the district court may consider, once it determines that reimbursement costs should be awarded, is "the appropriate and reasonable level of reimbursement that should be required." *Carter,* 510 U.S. at 16, 114 S.Ct. at 366. A district court may decide, for example, that the costs of the particular private school education were unreasonable or inappropri-

ate, given the circumstances. In that case, the district court is free to award only those costs that the district court deems are reasonable. In any event, it is the district court's role in the first instance to weigh the equities in each case and allocate responsibility after considering all relevant factors.

We disagree, then, both with MSDE, which asserts that an SEA can never be held liable for an LEA's failure to develop an IEP, and with the Gadsbys, who assert that an SEA should always be held liable for an LEA's failure to provide a free appropriate public education, regardless of the particular circumstances of the case. Instead, we hold, in accordance with *Burlington* and *Carter,* that district courts have broad discretion in granting appropriate relief under IDEA. This relief may include an award of reimbursement of private school tuition against the SEA, the LEA, or both. This relief may only be awarded, however, after the district court considers all relevant factors in fashioning appropriate equitable relief.

### 6.

■ Applying these principles to the facts of this case, we hold that the district court erred when it held that MSDE could not be held liable in this case because its decision to return BCPS's application on behalf of Eric implicated only State law, not IDEA. As established above, an SEA may be held liable for the reimbursement of a child's private school tuition under IDEA, even if state law requirements regarding the approval of the private placement are not met. In addition, an SEA may be held liable for reimbursement costs, even where the LEA fails to develop an appropriate IEP for the child.

Because the district court erred in holding that MSDE could not be held liable under IDEA, we must remand the case for the district court to determine what, if any, relief is appropriate. In so doing, the district court should consider all relevant factors, including the relative responsibility of each agency involved in the failure to provide Eric with a free appropriate public education and, if the court determines that the award of reimbursement costs of Eric's Forman School

tuition is appropriate, the reasonable level of reimbursement that should be awarded. We note that the district court is free to hold MSDE, BCPS, or both agencies liable as it deems appropriate after considering all relevant factors.[6]

## C.

The Gadsbys also assert that MSDE violated IDEA's notice provisions when it failed to notify the Gadsbys before effectively denying BCPS's reimbursement application on behalf of Eric. According to the Gadsbys, this violation constituted an independent denial of a free appropriate public education to Eric on the part of MSDE, giving rise to an obligation to reimburse the Gadsbys for the remaining portion of Eric's Forman School tuition for the 1993–94 school year. We disagree.

As set forth above, in addition to its substantive provisions, IDEA contains an extensive set of procedural provisions designed to ensure that the parents or guardian of a child with a disability are both notified of decisions affecting their child and given an opportunity to object to these decisions. *See* 20 U.S.C. § 1415. Among these provisions is a notice provision, requiring prior written notice to parents whenever an agency proposes or refuses to initiate or change the identification, evaluation, or educational placement of the child or the provision of a free appropriate public education to the child. *See id.* § 1415(b)(1)(C). Under 34 C.F.R. § 300.505, this notice must include an explanation of all procedural safeguards available to the parents; a description of the action proposed or refused by the agency; an explanation of why the agency proposes or refuses to take the action; a description of each evaluation procedure, test, record, or report used by the agency as a basis for the proposal or refusal; and a description of any other factors that are relevant to the agency's proposal or refusal. *See* 34 C.F.R. 300.504 (1996).

We have previously held that the failure to comply with IDEA's procedural requirements, such as the notice provision, can be a sufficient basis for holding that a government entity has failed to provide a free appropriate public education. *Hall v. Vance County Bd. of Educ.*, 774 F.2d 629, 635 (4th Cir.1985). However, to the extent that the procedural violations did not actually interfere with the provision of a free appropriate public education, these violations are not sufficient to support a finding that an agency failed to provide a free appropriate public education. *See Tice v. Botetourt County Sch. Bd.*, 908 F.2d 1200, 1207 (4th Cir.1990) (no reimbursement for private placement where violation of IDEA notice requirement did not affect development of child's IEP or provision of free appropriate public education); *see also G.D. v. Westmoreland Sch. Dist.*, 930 F.2d 942, 949 (1st Cir. 1991) (no violation of notice requirement where parent received copies of meeting minutes after meeting at which change in placement was decided where change was never implemented).

In this case, even if we accept the Gadsbys' argument that MSDE's refusal to consider BCPS's application for reimbursement on Eric's behalf constituted a denial of that application, giving rise to MSDE's obligation to give the Gadsbys prior notice of its decision, there is no evidence that the State's failure to notify the Gadsbys resulted in any interference with the provision of a free appropriate public education to Eric. The Gadsbys received a copy of MSDE's letter to BCPS within two weeks of its decision and almost one month before the next hearing on Eric's application, which was held before the LCC. Because any violation of the notice provisions did not interfere with the provision of a free appropriate public education to Eric, these violations cannot subject MSDE to liability for reimbursement of Eric's Forman School tuition.

---

**6.** We recognize, of course, that BCPS's liability is limited by its settlement with the Gadsbys. However, the district court may still determine that BCPS is primarily, or even completely, responsible for the costs of Eric's Forman School tuition.

In the event that the district court deems that the award of reimbursement costs is appropriate but that MSDE should not be responsible for those costs under the circumstances of this case, it is free to deny the Gadsbys relief against MSDE.

### III.

For the reasons set forth above, we vacate the district court's judgment in favor of MSDE and remand the matter to the district court for further proceedings consistent with this opinion.

*VACATED AND REMANDED FOR FURTHER PROCEEDINGS.*

