10 F.Supp.2d 971 (1998)
BOARD OF EDUCATION OF OAK PARK & RIVER FOREST HIGH SCHOOL DISTRICT NUMBER 200, Plaintiff,
v.
ILLINOIS STATE BOARD OF EDUCATION and Kelly E., by and through her parent and next friend, Nancy E., Defendants.
No. 98 C 2390.
United States District Court, N.D. Illinois, Eastern Division.
July 9, 1998.
*972 *973 John A. Relias, Thomas Koutsouvas, Franczek Sullivan P.C., Chicago, IL, for Plaintiff.
Matthew D. Cohen, Olga F. Pribyl, Cynthia M. Masbaum, Monahan & Cohen, Chicago, IL, for Kelly E.
Courtnay C. O'Connell, Assistant Attorney General, General Law Bureau, Chicago, IL, for Illinois State Board of Education.

MEMORANDUM OPINION AND ORDER
MORTON DENLOW, United States Magistrate Judge.
Defendant Kelly E. ("Kelly"), by and through her parent and next friend Nancy E., brings before the Court a Motion for Statutory Injunction to Enforce the Level II Review Officer's Decision. This motion arises out of Plaintiff Board of Education of Oak Park & River Forest High School District Number 200's ("the School District") action under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq. (1998), against Defendants Kelly and the Illinois State Board of Education ("ISBE") appealing an administrative decision requiring the School District to reimburse Kelly's parents for all costs incurred to educate Kelly at Eagle Hill School in Massachusetts. The administrative hearings concerned the special educational needs of Kelly and her appropriate educational placement.
The present motion seeks a statutory injunction pursuant to 20 U.S.C. § 1415(e)(3)(A) requiring the School District *974 to comply with the review officer's decision and to pay all costs associated with Kelly's placement at Eagle Hill School until this matter is finally resolved. For the following reasons, the Court grants Kelly's motion and orders the statutory injunction.

I. BACKGROUND FACTS

A. Kelly's Attendance at Oak Park
Kelly is an eighteen-year-old woman who first became a student within the School District when she enrolled as a freshman at Oak Park River Forest High School ("Oak Park") at the beginning of the 1994/95 school year. (Kelly E.'s Mot. for Statutory Inj. to Enforce the Level II Review Officer's Dec. ("Kelly E.'s Mot.") ¶ 1.) Kelly has an extensive history of behavioral and academic difficulties, beginning in the third grade. (Kelly E.'s Mot. ¶ 4.) Kelly has been eligible for special education and related services pursuant to the IDEA since May 9, 1994, under the Behavior Disorder (BD) category. (Kelly E.'s Mot. ¶ 2.)
During both the 1994/95 and 1995/96 school years, Kelly's parents sought intervention from the School District regarding Kelly's behavioral and reading difficulties. (Kelly E.'s Mot. ¶ 8.) Kelly's severe academic problems throughout this period are documented. (Kelly E.'s Mot. Ex. A, Level I Impartial Due Process Hearing Decision ("Level I Dec.") at 4.) During two years at Oak Park, Kelly obtained only half of the expected number of credits, and during her last semester at Oak Park, Kelly failed all of her academic courses. (Kelly E.'s Mot. ¶ 7.) On April 5, 1995, at a conference between school personnel and Kelly's parents, the School District's multidisciplinary team recommended that a psychological evaluation be conducted by June 1995 to determine whether Kelly had any learning disability. (Level I Dec. at 4.) No evaluation was conducted because the School District's psychologist believed that an 8th grade evaluation, indicating the lack of a learning disability, was sufficient. (Level I Dec. at 5; 6-7.) Although a self-contained learning-disability class was available at Oak Park, Kelly was never placed in this class. (Level I Dec. at 5.)
Kelly was hospitalized in February and May 1996 and diagnosed with Attention Deficit Hyperactivity Disorder ["ADHD"], Oppositional Defiant Disorder, Polysubstance Abuse, and possible Bipolar Disorder. (Kelly E.'s Mot. ¶ 9.)

B. Kelly's Move to Eagle Hill
In September 1996, Kelly's parents unilaterally withdrew Kelly from attendance at Oak Park and placed her at Eagle Hill School, a residential school in Massachusetts, which serves students with learning disabilities, ADHD, and emotional and behavioral difficulties. (Kelly E.'s Mot. ¶ 10.) Eagle Hill School is not an ISBE-approved residential facility. (Level I Dec. at 8.) In February and March 1997, Kelly's parents obtained independent psychological and learning disabilities evaluations that confirmed that Kelly had a specific learning disability that had not been identified by the School District. (Kelly E.'s Mot. ¶ 14.)

C. Due Process Hearings
On March 28, 1997, Kelly's parents filed a request for a special education due process hearing, seeking reimbursement for the cost of Kelly's placement at Eagle Hill and the cost of the independent evaluations. (Kelly E.'s Mot. ¶ 15.) A Level I special education due process hearing was conducted before Impartial Hearing Officer ("IHO") Gregory Waas, Ph.D. on October 30, November 20, and December 10, 1997. (Kelly E.'s Mot. ¶ 16.) The Level I Decision, granting partial relief to Kelly's parents, contained the following order:
1. Within 10 days from the last day to appeal this Order, and sooner if possible, the District shall convene an IEP [Individualized Education Program] meeting for the following purposes:
a. Identify Eagle Hill school as the appropriate placement for KE [Kelly E.] through the summer 1998 term;
b. Indicate that the District will pay for all tuition costs for KE's enrollment at Eagle Hill (the District is not liable for costs associated with KE's room and board while at Eagle Hill);

*975 c. Indicate that the District will pay for 50% of KE's travel costs for regularly scheduled school breaks/holidays.
2. The District shall reimburse KE's parents for the following documented costs:
a. All tuition costs for KE's enrollment at Eagle Hill (the District is not liable for costs associated with KE's room and board while at Eagle Hill);
b. 50% of all travel costs associated with KE's enrollment at Eagle Hill;
c. All costs associated with independent evaluations conducted by Ms. Mary Ellen Gavin and Dr. Richard D. Guerra.
(Level I Dec. at 11.)
The School District and Kelly's parents appealed the Level I decision. (Kelly E.'s Mot. ¶ 18-19.) Level II Review Officer Julius Menacker conducted the Level II Special Education hearing on March 12, 1998. (Kelly E.'s Mot. ¶ 20.)
The Level II Decision, issued on March 30, 1998, ordered the following:
1. The District shall, upon receipt of evidence of cost, reimburse parents for one of the evaluations of the student, which will be the first one, conducted by Mary Ellen Gavin.
2. The District shall reimburse parents for full costs, including transportation, associated with the placement of the student at Eagle Hill from the time of enrollment through the summer term, 1998.
3. At the conclusion of the 1998 school term, a multidisciplinary conference is to be held to determine the future IEP which will provide the student with FAPE [Free Appropriate Public Education].
4. The District shall submit proof of compliance with this order to Program Monitoring/Development Section, Department of Special Education, Illinois State Board of Education, 100 North First Street, Springfield, Illinois, XXXXX-XXXX no later than 45 days from receipt of this order.
(Kelly E.'s Mot. Ex. B, Illinois State Board of Education Level II Special Education Review Decision ("Level II Dec.") at 13.)
The School District did not comply with the order and appealed the Level II decision in district court on April 17, 1998. (Kelly E.'s Mot. ¶ 23.) Oral Argument was held on the present motion on July 1, 1998.

II. THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT
The purpose of the IDEA is
to assure that all children with disabilities have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs, to assure that the rights of children with disabilities and their parents or guardians are protected, to assist States and localities to provide for the education of all children with disabilities, and to assess and assure the effectiveness of efforts to educate children with disabilities.
20 U.S.C. § 1400(c).
To receive financial assistance under the IDEA, states must assure that
all children residing in the State who are disabled, regardless of the severity of their disability, and who are in need of special education and related services are identified, located, and evaluated, and that a practical method is developed and implemented to determine which children are currently receiving needed special education and related services and which children are not currently receiving needed special education and related services.
20 U.S.C. 1412(2)(C).
The IDEA "confers upon disabled students an enforceable substantive right to public education in participating States." Honig v. Doe, 484 U.S. 305, 310, 108 S.Ct. 592, 597, 98 L.Ed.2d 686 (1988). The "primary vehicle" of the IDEA's implementation is the individualized educational program ("IEP"). Id. at 310, 108 S.Ct. at 597. The IEP, mandated for each disabled child, is an educational plan developed specifically for the child by the local school district, the *976 child's teacher, the parents or guardians, and, where appropriate, the child. See 20 U.S.C. § 1401(a)(20). "[T]he IEP sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." Honig, 484 U.S. at 311, 108 S.Ct. at 598; see also 20 U.S.C. § 1401(a)(20). The IEP must be annually reviewed and revised where necessary. Honig, 484 U.S. at 311, 108 S.Ct. at 598. The IEP is the "centerpiece" of the IDEA, and "Congress repeatedly emphasized throughout the Act the importance and indeed the necessity of parental participation in both the development of the IEP and any subsequent assessment of its effectiveness." Id. at 311, 108 S.Ct. at 598.

A. Procedural Safeguards
The IDEA "establishes various procedural safeguards that guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate." Id. at 311-12, 108 S.Ct. at 598. These safeguards include, inter alia, an "opportunity to present complaints concerning any aspect of the local agency's provision of a free education; and an opportunity for `an impartial due process hearing' with respect to any such complaints." Id. at 312, 108 S.Ct. at 598; see also 20 U.S.C. 1415(b)(1)(E), (b)(2). Such hearing "shall be conducted by the State educational agency or by the local educational agency or intermediate educational unit, as determined by State law or by the State educational agency." 20 U.S.C. § 1415(b)(2). The result of hearings conducted by a local educational agency or intermediate educational unit may be appealed to the State educational agency for impartial review. See 20 U.S.C. § 1415(c). A party aggrieved by the findings of the impartial review, or by the decision of the impartial hearing if there is no right to review, may bring action in the district court. See 20 U.S.C. § 1415(e)(2).
At the time that Kelly's parents initially sought an impartial due process hearing under the IDEA, Illinois provided for the administrative review pursuant to § 1415(c). The impartial hearing and the impartial review resulted in rulings favorable to Kelly's parents. The present action is brought by the school district pursuant to § 1415(e)(2).

B. The Stay-Put Provision
The stay-put provision, at the heart of the motion presently before the Court, "governs the placement of the child while these often lengthy review procedures run their course." Honig, 484 U.S. at 312, 108 S.Ct. at 598. It provides that:
During the pendency of any proceedings conducted pursuant to [§ 1415], unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement of such child ....
20 U.S.C. § 1415(e)(3)(A). Kelly seeks to stay put at Eagle Hill and to require the School District to pay until this litigation is resolved. This case raises the issues of what constitutes Kelly's "then current educational placement" and whether an agreement to change that placement exists. The Court holds that Eagle Hill became Kelly's then current placement for stay-put purposes when the Level II hearing officer affirmed the parents' placement of Kelly at Eagle Hill. As an alternative basis for finding that Eagle Hill is Kelly's then current placement, the Court finds that the Level II hearing officer's decision constitutes agreement by the State to the parents' placement.

1. The Then Current Placement
The Seventh Circuit has been "hesitant to definitively establish the meaning of `educational placement' and has adopted a "fact-driven approach." Bd. of Educ. of Community High Sch. Dist. No. 218, Cook Co., Illinois v. Illinois State Bd. of Educ., 103 F.3d 545, 549 (7th Cir.1996). The court accepts "as the outer parameters of `educational placement' that it means something more than the actual school attended by the child and something less than the child's ultimate educational goals." Id. When Kelly's parents unilaterally removed her from public high school within the School District, Kelly's most recent IEP called for placement at Oak Park. Thus, when Kelly's parents *977 initially sought an impartial due process hearing, Oak Park was Kelly's "then current placement." When Kelly's parents unilaterally removed Kelly from Oak Park they changed her placement and "contravened the conditional command of § 1415(e)(3) that `the child shall remain in the then current educational placement.'" Sch. Comm. of the Town of Burlington, Mass. v. Dept. of Educ. of Mass., 471 U.S. 359, 371-72, 105 S.Ct. 1996, 2003, 85 L.Ed.2d 385 (1985).
In Burlington, the disabled child's parents had rejected a proposed IEP calling for the child's placement in a public school and enrolled him in a state-approved private school for special education. See 471 U.S. at 362, 105 S.Ct. at 1999. The parents sought review under § 1415(b)(2) by the state department of education's Bureau of Special Education Appeals ("BSEA"). See id. at 362, 105 S.Ct. at 1999. After several hearings, the BSEA's hearing officer decided that the town's proposed placement at a public school was inappropriate, found in favor of the parents placement, and ordered the town to pay for the child's expenses at the private school, including reimbursement to the parents for the expenditures made up to that point. See id. at 363, 105 S.Ct. at 1999. There being only one administrative level, the town sought judicial review pursuant to § 1415(e)(2). See id. at 363, 105 S.Ct. at 1999.
The Supreme Court "refused to give the stay put provisions a reading that would force parents to leave a child in what they feel may be an inappropriate educational placement, or act at their peril in keeping a child in their chosen placement, after a successful administrative ruling." Clovis Unified Sch. Dist. v. California Office of Admin. Hearings, 903 F.2d 635, 641 (9th Cir.1990)(citing Burlington, 471 U.S. at 372-73, 105 S.Ct. at 2003-04). "The Court took the view that once the State educational agency decided that the parents' placement was the appropriate placement, it became the `then current placement' within the meaning of section 1415(e)(3)." Clovis, 903 F.2d at 641. Otherwise, "the child's right to a free appropriate public education, the parents' right to participate fully in developing a proper IEP, and all of the procedural safeguards would be less than complete." Burlington, 471 U.S. at 370, 105 S.Ct. at 2003. The Supreme Court found that the legislative history supported a "proper interim placement pending resolution of disagreements over the IEP." Id. at 373, 105 S.Ct. at 2004 (emphasis supplied).
This Court holds that, under Burlington, once a final state education administrative decision rules that the parents' placement is the appropriate placement, it becomes the "then current educational placement" within the meaning of § 1415(e)(3). Thus, Kelly's stay-put placement became Eagle Hill School on March 30, 1998, the date the Level II Decision issued. To hold otherwise would mean that parents who could not afford a private placement would be forced to maintain their child in a public placement that an administrative decision held to be inappropriate. This would contravene the purpose of the stay-put provision which is "to ensure that the educational needs of a child are met during the pendency of any proceedings conducted pursuant to the IDEA." Sch. Dist. No. 218, 103 F.3d at 546. Furthermore, a contrary holding would render an administrative decision in favor of the parents practically meaningless "unless and until it is affirmed by a decision that cannot be or is not appealed." Raelee S., 96 F.3d at 84. Eagle Hill as Kelly's stay-put placement comports with the purposes of the statute because it is the placement that an impartial hearing officer has determined to be the appropriate choice following a due process hearing.

2. Alternatively, the Administrative Decision Constitutes the State's Agreement to a Change in the Current Placement
Under the stay-put provision, the current placement remains the pendant placement "unless the State or local educational agency and the parents ... otherwise agree." § 1415(e)(3)(A). In deciding that § 1415(e)(3) does not bar reimbursement to parents who reject a proposed IEP and place a child in a private school without the consent of local school authorities, the Supreme Court in Burlington stated that "[t]he *978 BSEA's decision in favor of the [parents] and the [private school] placement would seem to constitute agreement by the State to the change of placement." Id. at 372, 105 S.Ct. at 2004. Beginning with the date the administrative decision was issued, the parents were no longer in violation of § 1415(e)(3). See id. at 372, 105 S.Ct. at 2004.
In the present case, Kelly argues that the Level II review officer's finding in favor of Kelly's parents constitutes an agreement that her placement for stay-put purposes changed to Eagle Hill School. The School District argues that it did not agree to any change in Kelly's placement, as evidenced by its appeals of the administrative decisions. In the alternative, the School District argues that if any party agreed to the change in placement, it was the ISBE, thus the injunction sought by the parents should be directed against the ISBE. The ISBE denies that the independent hearing and review officers' decisions constitute agreement by the state to a change in Kelly's placement.
The Seventh Circuit has not addressed whether an administrative decision in favor of the parents constitutes agreement by the state or local educational authorities to a change in the stay-put placement. Other circuit and district courts have held that a state education administrative decision in favor of the parents' position constitutes agreement specifically by the State to the changed placement. See, e.g., St. Tammany Parish Sch. Bd. v. Louisiana, 142 F.3d 776, 787 (5th Cir.1998)("Consistent with Burlington, the district court did not abuse its discretion by concluding that, for purposes of § 1415(e)(3), the Review Panel decision constituted an `agreement' between the State and the [parents] that, during the pendency of this action, [the private school] was the appropriate educational placement"); Susquenita Sch. Dist. v. Raelee S., 96 F.3d 78, 83 (3rd Cir. 1996)("from the point of the panel decision forward ... [the child's] pendant placement, by agreement of the state, is the private school"); A.P. v. McGrew, No. 97 C 5876, 1998 WL 214706, at *4 (N.D.Ill. April 24, 1998)(collecting cases).
Although the Court has found above that once the final state education administrative decision rules that the parents' placement is the appropriate placement, it becomes the "then current educational placement," the Court holds that a separate basis for finding that a parents' chosen placement becomes the stay-put placement is that a final administrative decision constitutes agreement specifically by the State to the changed placement. Thus, the Level II review officer's decision constituted agreement by the State that Eagle Hill is Kelly's pendant placement.

3. Who Pays
The School District points to the language of the stay-put provision that agreement with the parents by either the State or the local school district changes the child's placement. The School District argues that the impartial review officer's decision constitutes agreement by the State, not the School District, to the changed placement. Consequently, the ISBE, not the School District, should bear the costs. Not surprisingly, the ISBE disagrees.
Although the Court agrees that a final administrative decision, in this case the Level II review officer's decision, constitutes agreement specifically by the State to the changed placement, the Court disagrees that it necessarily follows that the state educational agency must bear the costs of the stay-put placement. Apparently, only a few school districts have confronted courts with this argument that the state educational agency is responsible for the costs of the pendant placement. See, e.g., Donna and Douglas S. v. Louisiana, 26 IDELR 1108 (E.D.La.1997), aff'd, St. Tammany, 142 F.3d 776 (5th Cir.1998); Jeffreys v. New Jersey, 23 IDELR 945 (D.N.J.1996).
In St. Tammany, the Fifth Circuit recently agreed that "`there is nothing in either the language or the structure of IDEA that limits the district court's authority to award reimbursement costs against the [state educational agency], the [local educational agency], or both in any particular case.'" 142 F.3d at 783-84 (quoting Gadsby v. Grasmick, 109 F.3d 940, 955 (4th Cir.1997)). The Fifth Circuit found that the district court did not abuse its discretion in assigning the pendant-placement costs to the state educational *979 agency rather than to the local school board. 142 F.3d at 785.
The St. Tammany court relied in part upon statutory language that places ultimate responsibility for implementation of IDEA goals upon the state educational agency:
The State educational agency shall be responsible for assuring that the requirements of this subchapter are carried out and that all educational programs for children with disabilities within the State, including all such programs administered by any other State or local agency, will be under the general supervision of the persons responsible for educational programs for children with disabilities in the State educational agency and shall meet education standards of the State educational agency.
20 U.S.C. 1412(6). Also, the "IDEA requires state educational agencies to establish policies and procedures for the administration of funds to local educational agencies and to ensure that those funds are expended in accordance with IDEA's provisions." St. Tammany, 142 F.3d at 784. Furthermore, the state educational agency must
set forth policies and procedures for developing and implementing interagency agreements between the State educational agency and other appropriate State and local agencies to 
(A) define the financial responsibility of each agency for providing children with disabilities and youth with free appropriate public education, and
(B) resolve interagency disputes, including procedures under which local educational agencies may initiate proceedings under the agreement in order to secure reimbursement from other agencies or otherwise implement the provisions of the agreement; ....
20 U.S.C. § 1413(a)(13).
The St. Tammany court also relied on § 1415(e)(2) that gives the district court authority to "grant such relief as [it] deems appropriate." 142 F.3d at 783. "Reimbursement to parents for private school tuition (whether retroactive or pending a merits-decision) is an equitable remedy, which may be imposed in the discretion of the district court." Id. The appellate court noted with approval that the district court considered several factors concerning "the relative responsibility of each agency for the ultimate failure to provide a child with a free appropriate public education" in fashioning the appropriate relief:
(1) the School Board had requested that the State participate in administrative hearings, but it refused; (2) the State defendants had a full opportunity to brief and orally argue the cost allocation issue; (3) pursuant to § 1412(6), the Department is ultimately responsible for implementing IDEA's provisions; and (4) Congress' goal of ensuring consistency and stability in a disabled child's education would be thwarted if interagency budgetary disputes were allowed to disrupt the financing of that child's educational placement.
Id. at 785 (internal quotations and citations omitted).
After final resolution on the merits, several courts have held that the state educational agency rather than the local school district could be held responsible for the costs of private placement. In Gadsby, the Fourth Circuit held that parents could maintain a cause of action against the state educational agency for reimbursement for private placement where the local school district had failed to develop an appropriate IEP. See 109 F.3d at 953. In Kruelle v. New Castle County Sch. Dist., 642 F.2d 687, 697 (3rd Cir. 1981), the court upheld the district court's assignment of responsibility for the child's residential placement on the state educational agency, stating:
By placing the burden for coordinating efforts and financial arrangements for [the child's] education on the State Board of Education, the trial judge was both reflecting legislative intent and appropriately observing the limits of his institutional role. * * * Resolution of any interagency conflicts or delegation of duties from state to regional and local levels was left, as it should have been, in the hands of the state officials.
The Court agrees that § 1415(e)(2), giving the district court the authority to "grant such relief as [it] deems appropriate," authorizes the district court to order either *980 the school district or the state educational agency, or both, to bear the costs of the stay-put placement. At this preliminary stage, the Court is hesitant to delve into the funding allocation between the state and the local school districts. At oral argument, the parties indicated that formulae are in place for determining the reimbursement to school districts from the State for the costs of a student's special education that exceed the costs of a regular education. Furthermore, although the IDEA holds the state educational agency primarily responsible for its implementation, the state may fulfill its responsibility in a supervisory capacity. Under the IDEA, the state must define the financial responsibilities of agencies delivering special education to students. In normal course, the school districts pay the costs of providing students with special education and are reimbursed for the appropriate portion by the state educational agency. The Court sees no reason why this case mandates a different approach.
The School District argued orally that because Eagle Hill is not an ISBE-approved residential facility, it will be precluded by state regulations from seeking reimbursement from the ISBE. However, oral argument also revealed that a special petition can be made to the ISBE to grant an exception for Eagle Hill. The Court finds that the School District must bear the costs of Kelly's pendant placement without prejudice to its right to later seek reimbursement from the ISBE.

4. The Stay-Put Provision Acts as an Automatic Statutory Injunction In This Case
The School District argues that the stay-put provision does not act as a statutory injunction and that Kelly must meet the traditional four factors required for a preliminary injunction. Although the Seventh Circuit has not definitively ruled on this issue, it has provided some guidance.
In Rodiriecus L. v. Waukegan Sch. Dist. No. 60, 90 F.3d 249, 252 (7th Cir.1996), the court addressed the question of "whether the stay-put provision applies to a child not yet diagnosed as disabled." The court started "with the proposition that the stay put order is a preliminary injunction." Id. at 253. The court noted that "[v]arious courts have described the stay put provision as an `automatic injunction' applicable whenever the statutory criteria are met." Id. (collecting cases). Finding that the statute is not definite as to whether it applies to students not yet diagnosed as disabled, the court declined to apply the injunction automatically in that case. See id. at 254. Thus, in the case where a student has not yet been diagnosed as disabled, application of the four traditional factors to determine whether a preliminary injunction should issue is appropriate. See id.
In Sch. Dist. No. 218, the court considered "whether an injunction issued pursuant to the stay-put provision warrants an evidentiary hearing." 103 F.3d 545, 549. The court distinguished the situation before it from Rodiriecus because the child in the Sch. Dist. No. 218 case had been identified as disabled. Id. at 550. The court stated:
The equitable balancing reserved for preliminary injunctions has no place in this context. * * * If we were, in the instant case, to import these equitable factors into the stay-put provision, we would dilute the statutory framework. [The child] has been deemed eligible for assistance under the IDEA; the statute guarantees that he and his parents be able to rely on an uninterrupted education during a contest between the school board and the parents.
Id.
The Court finds that the statutory criteria are met in the present case and that the statutory injunction is automatic. Kelly has been determined eligible for assistance under the IDEA, and thus, the "equitable balancing reserved for preliminary injunctions has no place in this context." Id.
The School District argued orally before the Court that the present situation is distinguishable from Sch. Dist. No. 218 because in that case the child's placement under the stay-put provision maintained the then current placement; that is, there was no change in the child's placement by agreement between the state or school district and the parents. The School District is correct that the parents in Sch. Dist. No. 218 did not *981 obtain a stay-put placement by virtue of state or school district agreement to a change in the then current placement. However, this fact was not determinative of the court's conclusion that the stay-put provision operated as an automatic injunction in that case. See id. at 549-50. The first task before the Seventh Circuit in Sch. Dist. No. 218 was to determine the meaning of "educational placement" and whether the district court's injunctive order preserved, under the stay-put provision, the child's educational placement. See id. at 548-549. After deciding that the district court's order did preserve the child's educational placement because the court-ordered placement could implement the IEP, which remained consistent throughout various school transfers, the Seventh Circuit then proceeded to address the question of whether the stay-put provision is an automatic injunction. See id. at 549.
The Seventh Circuit's consideration in Sch. Dist. No. 218 of the automatic injunction issue is not tied to the case's complicated history of placements. See id. at 550. Instead, whether to interject the preliminary injunction factors depends on whether the statutory criteria are met. See id. Parents, like Kelly's, who move their child to another placement that becomes the current placement under the stay-put provision after an impartial hearing officer finds it to be the appropriate placement do not have to jump through more hoops to require the school district to pay for that placement.

5. Alternatively, the Equitable Preliminary Injunction Factors Are Met
Although the Court finds that the statutory injunction is automatic, the Court also finds that Kelly meets the traditional preliminary injunction factors. "In deciding whether to grant a preliminary injunction, a court must weigh four factors: (1) the movant's likelihood of success on the merits of his [or her] claim; (2) the irreparability of the harm to the movant if the injunction does not issue; (3) whether the harm to the movant outweighs the harm to the non-movants; and (4) the public interest." Rodiriecus, 90 F.3d at 254.
The Court finds that Kelly is likely to succeed on the merits because both administrative decisions have ruled in favor of the parents. The irreparability of the harm to Kelly if the injunction does not issue depends on whether she will actually be forced to leave Eagle Hill if the school district is not ordered to pay. After reviewing the Supplemental Affidavit of Nancy E., the Court concludes that Kelly's parents cannot afford to pay her tuition at Eagle Hill and that Kelly will be refused admission if payment is not made by August 1, 1998. The Court finds that the harm that Kelly would suffer if she is forced to leave Eagle Hill outweighs the harm that the School District will suffer by the requirement that it pay the costs of the pendant placement. Lastly, the public interest is served by the preliminary injunction because it insures the continuing effectiveness of the IDEA.

6. Kelly Must Pay a Nominal Bond
The School District argues that Kelly must post a bond if the stay-put injunction is ordered. Federal Rule of Civil Procedure 65(c) provides that "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, ...."
The Donna and Douglas S. court considered the imposition of a bond where a stay-put injunction was ordered:
[T]he requirement of a bond would be counterintuitive to the statute. By virtue of the State Level Review Panel's decision, the state has agreed as a matter of law with the child's placement. Even if the Court were to eventually decide that the panel's decision was in error, an agreement still exists for the period of time leading up to this Court's decision and the parents would not be deemed in violation of the law during that time frame. The parents, therefore, should not be made to reimburse the state or school board for a placement with which the state agreed and for which no violation of law took place. In this interim period, the parents are deemed in compliance with the IDEA and [the child] is entitled to a free, appropriate public education. To require a bond would place the parents at the same financial risk *982 as those parents who inappropriately change their child's placement.
26 IDELR 1108.
However, the Seventh Circuit implied that a bond would be appropriate with a stay-put injunction where the school district requests one. See Bd. of Educ. of Oak Park & River Forest High Sch. Dist. 200 v. Illinois State Bd. of Educ., 79 F.3d 654, 659 (7th Cir.1996). Therefore, the Court will not ignore Rule 65's mandate and will order Kelly to post a bond. However, considering the purposes of the IDEA and the parents financial situation, the Court in its discretion orders that a nominal bond of $10 be posted with the Clerk of the Court.

III. CONCLUSION
For the foregoing reasons, the Court grants Kelly's motion for statutory injunction. The Court orders the School District to (1) reimburse Kelly's parents for all costs, including transportation, associated with Kelly's placement at Eagle Hill School from March 12, 1998, the date of the Level II decision, to the present; (2) promptly pay, in time to insure that Kelly is enrolled for the fall 1998 school term, all costs, including transportation, associated with Kelly's placement at Eagle Hill School for the fall 1998 term; and (3) pay all future costs, including transportation, associated with Kelly's placement at Eagle Hill School until this matter is finally resolved. Kelly E., by and through her parent and next friend, Nancy E., shall post a $10 bond with the Clerk of the Court.