A98A0810. BRUTON et al. v. DEPARTMENT OF HUMAN
RESOURCES.
(509 SE2d 363)

ANDREWS, Chief Judge.

Rory Michael Bruton, acting as heir at law and administrator of the estate of his grandmother, Vera H. O'Brien, sued the Georgia Department of Human Resources (DHR) pursuant to the Georgia Tort Claims Act. He alleged that O'Brien's death at a personal care home subject to DHR rules and regulations was proximately caused by the DHR's negligence. The trial court granted summary judgment in favor of the DHR on the basis that sovereign immunity afforded to the DHR under the Georgia Tort Claims Act protected it from liability. Bruton appeals contending that sovereign immunity was not a defense under the circumstances.

In August 1994, O'Brien, who was 83 years of age, was admitted to the Ashton Hall Personal Care Home (the home), a personal care home licensed by the DHR and subject to rules and regulations promulgated by the DHR. OCGA §§ 31-7-12; 31-7-3; 31-7-2.1; 31-2-6; Rules of the Department of Human Resources, Chapter 290-5-35 (Personal Care Homes). The home was aware that O'Brien suffered from Alzheimer's disease and that, because of the disease, she was prone to wander from her room and about the home. On January 29, 1995, O'Brien wandered unsupervised out of the home in cold weather into an adjacent construction area, where she fell face down into shallow water and mud and died. According to the medical examiner's report, O'Brien died from "mechanical impairment of respiration and associated environmental exposure."

Bruton's suit against the DHR makes numerous claims of negligent action or failure to act by the DHR.[1] Essentially, the suit alleges that: (1) the DHR was negligent in conducting or failing to conduct adequate inspections of the home, and (2) the DHR knew O'Brien was not physically or mentally suitable for residence in a personal care home and negligently failed to take action to protect her from the risks posed by her continued residence at the home. As to the second allegation, Bruton contends the DHR negligently failed to conduct its own reassessment of O'Brien's condition pursuant to DHR Rule 290-5-35-.24 (3), and negligently failed to order an emergency relocation of O'Brien from the home to an appropriate facility pursuant to OCGA § 31-7-2.2 (a) (1).

In support of his claims, Bruton produced evidence of complaints about the home received by the DHR prior to O'Brien's death and evi-

---

[1] In addition to suing the DHR, Bruton sued the operator of the home, Curtis McGill, and Ashton Hall, Inc., the corporation which owned the home. Only the claims against the DHR are at issue in this appeal.

dence of the DHR's response to the complaints.

On October 5, 1993, the DHR completed investigation of a complaint that a resident of the home was in need of a level of care higher than that provided by a personal care home. Although the DHR found that the resident's physical condition was at best marginal for residence in a personal care home, the investigation showed that the resident was receiving adequate care from a visiting nurse and home health aides. The DHR concluded that, in light of the resident's improving physical condition and strong desire to remain at the home, it was appropriate that she remain at the home.

On April 5, 1994, the DHR received a report from a social worker that a resident of the home might need nursing care, and therefore the home might not be an appropriate residence for this individual. The record shows that the DHR investigated this report, but there is nothing in the record indicating the results of the investigation.

On May 13, 1994, the DHR received a report from the Gwinnett County Solicitor's Office indicating that, during a recent fire inspection of the home, fire inspectors observed violations of the fire code and saw at least two residents of the home who they believed might not be suitable for residence in a personal care home due to their medical or mental condition. A DHR memorandum dated June 10, 1994, in response to the report shows that two DHR employees, including a nurse, had recently visited the home and saw no problem. The DHR records also contained a subsequent fire safety inspection report on the home showing that the home was in compliance with fire safety requirements.

On December 7, 1994, a DHR nurse visited the home to investigate a complaint that a resident had not received assistance from the staff after falling inside the home. The nurse toured the entire home, reviewed residents' records, and discussed with Curtis McGill, the operator of the home, various violations of DHR regulations and the requirements for compliance with the regulations. The DHR visit confirmed that the home had taken corrective action regarding the cause of the complaint, and that staffing at the home met minimum requirements. During the visit, the nurse reviewed records on O'Brien's August 1994 admission to the home and talked to staff at the home about the level of care that O'Brien needed. The nurse noted that the admission records of some residents, including those of O'Brien, did not contain a physician's report of a physical examination as required by DHR regulations. At the conclusion of the visit, McGill agreed to a plan of correction by which he would correct all the noted deficiencies in the records by January 31, 1995, including obtaining a physician's report of a physical examination on all residents. McGill testified that, after the December 7, 1994 visit by the DHR nurse, Bruton provided him with a statement dated Decem-

ber 15, 1994, from O'Brien's physician stating that O'Brien had Alzheimer's disease and that this condition made it necessary for her to live in a personal care home.

O'Brien was not in her room at the time of the December 7, 1994 visit, and the nurse could not recall whether she personally saw her. The record does not reflect that the DHR had knowledge that O'Brien suffered from Alzheimer's disease, nor does it show that the DHR knew the extent of O'Brien's physical or mental impairment. The DHR nurse stated that one purpose of the rule requiring that a resident's admission records include a physician's report of a physical examination is to show that the resident does not need a level of care higher than that provided in a personal care home. Although the lack of a physician's physical examination report on O'Brien raised questions at the December 7, 1994 visit as to whether the home was an appropriate residence for O'Brien, the DHR nurse said she could not recall receiving any information during the visit that would have caused her to conclude that O'Brien needed continuous nursing care or some other higher level of care above the level of care provided by a personal care home.

After the DHR was informed of O'Brien's death on January 29, 1995, it conducted another inspection of the home and issued a report on January 31, 1995. In the report, the home was cited for being one resident over capacity and for violation of regulations regarding insufficient staffing required to protect residents.

In moving for summary judgment, the DHR asserted the defense of sovereign immunity to all of Bruton's claims. The 1991 amendment to Art. I, Sec. II, Par. IX of the Georgia Constitution of 1983 recognized that sovereign immunity was extended "to the state and all of its departments and agencies"; that such immunity "can only be waived by an Act of the General Assembly which specifically provides that sovereign immunity is thereby waived and the extent of such waiver[,]" and that "[t]he General Assembly may waive the state's sovereign immunity from suit by enacting a State Tort Claims Act. . . ." Ga. Const. of 1983, Art. I, Sec. II, Par. IX (a), (e). Thereafter, the General Assembly enacted the Georgia Tort Claims Act (OCGA § 50-21-20 et seq.) which provided for a limited waiver of the state's sovereign immunity and set forth exceptions to such waiver. OCGA §§ 50-21-23; 50-21-24. As a department of the state, the DHR is subject to the waiver and the exceptions set forth in the Georgia Tort Claims Act.

Section 50-21-24 of the Georgia Tort Claims Act enumerates 13 exceptions to the waiver of sovereign immunity. In granting summary judgment in favor of the DHR, the trial court concluded that the DHR was entitled to sovereign immunity from Bruton's claims under exceptions (2) and (8) of § 50-21-24. Exception (2) provides that

"[t]he state shall have no liability for losses resulting from: [t]he exercise or performance of or the failure to exercise or perform a discretionary function or duty on the part of a state officer or employee, whether or not the discretion involved is abused." Under OCGA § 50-21-22 (2), " '[d]iscretionary function or duty' means a function or duty requiring a state officer or employee to exercise his or her policy judgment in choosing among alternate courses of action based upon a consideration of social, political, or economic factors." Exception (8) provides that "[t]he state shall have no liability for losses resulting from: [i]nspection powers or functions, including failure to make an inspection or making an inadequate or negligent inspection of any property other than property owned by the state to determine whether the property complies with or violates any law, regulation, code, or ordinance or contains a hazard to health or safety."

Bruton concedes that, to the extent his claims state the DHR was negligent in conducting or failing to conduct adequate inspections of the home, the DHR was entitled to summary judgment on the basis of sovereign immunity under the inspection exception stated in OCGA § 50-21-24 (8).

As to the remaining allegations that the DHR knew it was dangerous for O'Brien to reside at the home and negligently failed to take action to protect her, Bruton contends the trial court erred in concluding that the DHR was entitled to summary judgment on the basis of sovereign immunity under the discretionary function or duty exception stated in OCGA § 50-21-24 (2). Bruton contends that no discretionary function or duty was at issue because, as defined by OCGA § 50-21-22 (2), a discretionary function or duty is limited to the exercise of a "policy judgment in choosing among alternate courses of action based upon a consideration of social, political, or economic factors." Specifically, Bruton contends that there was no exercise of a "policy judgment" within the definition of discretionary function or duty when the DHR decided not to conduct its own reassessment of O'Brien's condition pursuant to DHR Rule 290-5-35-.24 (3), and decided not to order an emergency relocation of O'Brien from the home to an appropriate facility pursuant to OCGA § 31-7-2.2 (a) (1).

Assuming O'Brien's physical or mental condition made it inappropriate under DHR rules for her to reside in a personal care home, the record does not establish that the DHR knew she needed a level of care higher than that provided in a personal care home. See DHR Rules 290-5-35-.15; 290-5-35-.04 (c). The record shows that the DHR investigated complaints about the home prior to its last investigative visit on December 7, 1994, about seven weeks before O'Brien's death. At the December 7, 1994 visit, the DHR nurse reviewed admission records, had conversations with the staff about residents' care needs,

and concluded there was a question about whether O'Brien and other residents met the criteria for residence in a personal care home. The nurse also noted that the records of some residents, including O'Brien, did not contain a physician's physical examination report establishing suitability for personal home care when they were admitted to the home, as required by DHR rules. DHR Rule 290-5-35-.15 (3). As a result of the December 7, 1994 visit, the DHR obtained an agreement by the administrator of the home to obtain the required physician's physical examination reports no later than January 31, 1995. Although the record does not reflect that a physical examination report in compliance with DHR rules was obtained, the home did obtain a statement from a physician dated December 15, 1994, stating that O'Brien had Alzheimer's disease, and that this condition made it necessary for her to live in a personal care home. Thereafter, O'Brien fell and died after wandering unsupervised from the home on January 29, 1995.

Under the circumstances, we conclude that the decision by the DHR to take the above action to determine if O'Brien was a suitable resident at the home rather than taking other action, including reassessing O'Brien under DHR Rule 290-5-35-.24 (3) or ordering emergency relocation under OCGA § 31-7-2.2 (a) (1), entailed policy judgments in which alternate courses of action were weighed in light of competing economic and social factors. *Northwest Ga. Regional Hosp. v. Wilkins*, 220 Ga. App. 534, 537 (469 SE2d 786) (1996); *Jackson v. Dept. of Human Resources*, 230 Ga. App. 595, 596 (497 SE2d 58) (1998); *Dollar v. Olmstead*, 232 Ga. App. 520, 523-524 (502 SE2d 472) (1998); OCGA § 50-21-22 (2).[2] The decision in *Dept. of Transp. v. Brown*, 267 Ga. 6-7 (471 SE2d 849) (1996), which discussed the difference between governmental policy decisions entitled to discretionary immunity and design and operational decisions not entitled to immunity, was made in the context of road construction by the DOT and is distinguishable from the present case on its facts. Accordingly,

---

[2] In so ruling, we assume for purposes of this opinion that the DHR could have ordered an emergency relocation of O'Brien pursuant to OCGA § 31-7-2.2 (a) (1). We reach no conclusion, however, as to whether the DHR was actually authorized to do so. Section 31-7-2.2 (a) (1) provides that "[t]he commissioner may order the emergency relocation of patients or residents from an institution subject to licensure under this chapter when the commissioner has determined that the patients or residents are subject to an imminent and substantial danger." However, subsection (d) of § 31-7-2.2 further provides that "[t]he commissioner may issue emergency orders pursuant to this Code section only if authorized by rules and regulations of the department. . . . [A]n emergency order is valid only if the order is authorized to be issued under this Code section and rules and regulations relating thereto." OCGA § 31-7-2.2 (d). Although we find no specific provision in the DHR rules and regulations relating to personal care homes (Chapter 290-5-35) authorizing the commissioner to order the emergency relocation of residents, we make no decision as to whether these rules or other rules and regulations of the DHR would authorize such an emergency order.

in making these decisions, the DHR was performing a discretionary function or duty within the exception stated in OCGA § 50-21-24 (2) and was entitled to summary judgment on the ground of sovereign immunity.

Bruton also contends the trial court erred in granting summary judgment to the DHR on the basis of sovereign immunity because, in response to the May 13, 1994 report on the home from the Gwinnett County Solicitor's Office, a DHR employee said the DHR "would investigate the matter and take whatever steps were necessary to protect the residents of [the home]." Bruton contends this response constituted the DHR's voluntary assumption of a noninspection-related duty to protect impaired residents of the home and rendered the DHR liable as a "Good Samaritan" for negligent failure to perform the assumed duty. See *Community Fed. Sav. &c. Assn. v. Foster Developers*, 179 Ga. App. 861, 865 (348 SE2d 326) (1986). Bruton apparently contends the DHR assumed a duty over and above any duty it had as a department of the state, and that sovereign immunity was no defense.

The DHR did nothing more than indicate it would investigate the report and take whatever action it deemed necessary. We find no merit to Bruton's contention that the DHR was liable as a "Good Samaritan."

*Judgment affirmed. Smith, J., and Senior Appellate Judge Harold R. Banke concur.*

DECIDED NOVEMBER 16, 1998

*Blasingame, Burch, Garrard & Ashley, Andrew J. Hill III, Rikard L. Bridges, Christopher G. Conley*, for appellants.

*Thurbert E. Baker, Attorney General, Kathleen M. Pacious, Deputy Attorney General, Loretta L. Pinkston, Senior Assistant Attorney General, Marla-Deen Brooks, Assistant Attorney General*, for appellee.