A09A1567. KING et al. v. PIONEER REGIONAL EDUCATIONAL SERVICE AGENCY et al.
(688 SE2d 7)

BLACKBURN, Presiding Judge.

While attending the Alpine Psychoeducational Program ("Alpine"), which is a school for students with severe emotional behavior disorders, Jonathan King committed suicide. Pursuant to 42 USC §

YALE LAW LIBRARY

1983, his parents, Donald and Tina King, sued Pioneer Regional Educational Service Agency ("Pioneer RESA"), which acts as a local school system in managing Alpine, alleging that Pioneer RESA violated their son's substantive due process rights under the Fourteenth Amendment of the United States Constitution. The Kings also sued the Georgia Department of Education ("DOE"), claiming that DOE was liable for Jonathan's death by failing to fulfill a duty under the Individuals with Disabilities Education Act ("IDEA"), 20 USC § 1400 et seq., to regulate Alpine's disciplinary procedures. Following the grant of both Pioneer RESA's motion for summary judgment and DOE's motion to dismiss, the Kings appeal, arguing that questions of material fact remain as to whether Pioneer RESA violated Jonathan's substantive due process rights and further arguing that their claims against DOE were not barred by sovereign immunity.

As to the Kings' contention that the trial court erred in granting Pioneer RESA's motion for summary judgment, we find that the Kings have not met the requirements of § 1983 in that they have not shown that the Alpine staff members were deliberately indifferent to Jonathan harming himself. Thus, the Kings have not demonstrated that Jonathan's suicide was caused by a violation of his substantive due process rights, and their § 1983 claims necessarily fail. Accordingly, we affirm the trial court's grant of summary judgment to Pioneer RESA.

As to the Kings' contention that the trial court erred in granting DOE's motion to dismiss, we find that the IDEA does not impose a duty upon DOE that would give rise to a tort claim and that the Kings have failed to show that DOE waived its sovereign immunity with regard to any other claims. Accordingly, we affirm the trial court's grant of DOE's motion to dismiss.

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c); *Britt v. Kelly & Picerne, Inc.*[1] "On appeal from the grant or denial of a motion for summary judgment, we review the evidence de novo, and all reasonable conclusions and inferences drawn from the evidence are construed in the light most favorable to the nonmovant." *McCaskill v. Carillo.*[2]

So construed, the evidence shows that Pioneer RESA is part of a statewide network of regional educational service agencies that were established to provide various shared services to local school systems. See OCGA § 20-2-270 (a). In essence, Pioneer RESA acts as the

---

[1] *Britt v. Kelly & Picerne, Inc.*, 258 Ga. App. 843 (575 SE2d 732) (2002).
[2] *McCaskill v. Carillo*, 263 Ga. App. 890 (589 SE2d 582) (2003).

equivalent of a local school district and has administrative responsibilities, including those of fiscal agent, for the schools within its designated geographical area. See OCGA § 20-2-270 (b) and (c); *North Ga. Regional Educational Svc. Agency v. Weaver.*[3] One of the schools for which Pioneer RESA is administratively responsible is Alpine, which is part of the Georgia Psychoeducational Network and which provides educational services for students with severe emotional behavior disorders. See OCGA § 20-2-270.1 (c). DOE is responsible for ensuring that Alpine is in compliance with the IDEA and other statutes for funding purposes, but it does not manage the school's day-to-day operations, as such is the responsibility of the local school system. See Ga. Const. of 1983, Art. VIII, Sec. V, Par. II.

In order to manage the behavioral issues endemic to many of the students who attend Alpine, the school uses a variety of intervention strategies, including talking with students, deducting behavior points, separating misbehaving students from other students by moving them to another part of the classroom, and sending a misbehaving student to what is known as a time-out room. The time-out room at Alpine is an approximately eight-foot-by-eight-foot room without furniture and with only one entrance. The door to the room can be locked from the outside and has a small glass window, which is protected by a metal grate. Students are sent to the time-out room when all other intervention strategies have failed or when the student's behavior poses immediate physical harm to himself or others. Alpine's procedures regarding use of time-out rooms required that a staff member remain just outside the door for the entire time that a student is in the time-out room to monitor the student. The procedures also required the monitor to visually check on the student every 15 minutes and to document the student's behavior on a time-out log, which was created for that purpose. Before sending a student to the time-out room, the monitor was required to take from the student any items that could be used to injure himself or to damage the room.

Jonathan King first enrolled at Alpine in the fall of 2002, at the age of eleven, and over the next two years, he attended the school intermittently during periods when he was not attending the local public school. Jonathan was enrolled at Alpine based on emotional and behavioral issues and had been diagnosed with ADHD at a young age. On several occasions during his enrollment at Alpine, he had made suicidal comments to a few of the school's staff members. However, when pursuant to school policy Alpine's school psycholo-

---

[3] *North Ga. Regional Educational Svc. Agency v. Weaver*, 272 Ga. 289, 291 (527 SE2d 864) (2000).

gist tried to discuss these threats with Jonathan, he would respond that he was only kidding and that he did not have a true intent to commit suicide. In addition, Jonathan's mother was aware of his suicidal comments but believed that he made these threats to harm himself as a means to manipulate her.

In late September 2004, Jonathan's parents caught him huffing gasoline. As part of his juvenile probation, he was admitted to a psychiatric hospital for evaluation and treatment for inhalant abuse. After approximately two weeks, he was discharged to resume his enrollment at Alpine. The hospital's discharge summary stated that Jonathan denied feeling suicidal and indicated that he could be safely discharged. A few weeks after he had resumed attending school, Jonathan became disruptive on a day that Alpine was conducting school-wide standardized testing and refused to participate in the testing. Because the testing was being conducted in nearly all of the school's available space, Jonathan spent the greater part of the next two days in the time-out room while the testing was ongoing. On both days, he made suicidal threats while in the time-out room, which were recorded by staff on the time-out logs and which were reported to his mother when she picked him up at the end of the day.

On November 15, 2004, Jonathan came to school in the morning wearing pants that were too loose around his waist. Because he did not have a belt with him, Jonathan asked his teacher if he could go to the classroom next door to ask Doug Jackson, a paraprofessional who had worked with Jonathan the previous year, if he had anything that could be used as a makeshift belt. His teacher agreed, and Jackson gave Jonathan a length of macrame from the classroom's art supplies to use as a belt. Later that morning, Jonathan and some other students were being disruptive while eating breakfast in the cafeteria. Consequently, his teacher asked substitute paraprofessional Kenneth Trotter to take Jonathan and the other students back to the classroom. Shortly after they returned, Jonathan began picking a fight with one of the other students. Despite Trotter's reprimands, Jonathan continued taunting the other student and eventually climbed over his study carrel in an attempt to attack him. After physically restraining Jonathan, Trotter took him into the hallway and asked Jackson to assist him in taking Jonathan to the time-out room.

Upon entering the time-out room, Jonathan removed his shoes and tossed them into the hallway. Jackson then asked him if his macrame belt was going to be a problem, and Jonathan responded that it would not. Thereafter, Jackson returned to his classroom and Trotter began to monitor Jonathan's behavior in the time-out room through the window on the door. During the first 15 minutes, Jonathan cursed, asked to be let out, and repeatedly hit the door. A

few minutes later, he became quiet, and thus Trotter decided to let him out of the room. However, as Trotter started to push the door open, he realized that all of Jonathan's weight was leaning against it. After quickly forcing the door open, Trotter discovered that Jonathan was unconscious, having hanged himself from the metal grate on the door's window with his macrame belt. Trotter immediately called for help, and within seconds a teacher arrived and began administering CPR. EMTs arrived several minutes later, but they were unable to revive Jonathan, and he was pronounced dead at the hospital.

Subsequently, Donald and Tina King, as Jonathan's parents, filed a wrongful death action against Pioneer RESA, Alpine,[4] and DOE. In their complaint, they alleged that, pursuant to 42 USC § 1983, Pioneer RESA deprived Jonathan of his substantive due process rights under the Fourteenth Amendment to the United States Constitution by failing to implement adequate policies and training regarding the use of the time-out rooms and prevention of suicide. The Kings also alleged that DOE was liable for their son's death under the Georgia Tort Claims Act, OCGA § 50-21-20 et seq., by failing to implement policies governing the use of time-out rooms despite a duty to do so.[5]

Thereafter, DOE moved to dismiss the Kings' claims against it on the ground that it had not waived sovereign immunity as to those claims.[6] The trial court granted DOE's motion to dismiss, and denied the Kings' motion for reconsideration of the issue, but also denied DOE's request for final judgment, reasoning that piecemeal appellate review could possibly be avoided if final judgment were granted to DOE after the disposition of Pioneer RESA's soon-to-be-filed motion for summary judgment. After discovery, Pioneer RESA filed a motion for summary judgment as to the Kings' § 1983 claims against it, which the trial court granted. The Kings now appeal both the grant of Pioneer RESA's motion for summary judgment and the grant of DOE's motion to dismiss.

1. The Kings contend that the trial court erred in granting summary judgment to Pioneer RESA as to their § 1983 claims.

---

[4] The trial court later dismissed Alpine, and the Kings do not appeal that ruling.

[5] DOE was not sued under 42 USC § 1983 because neither the State nor its agencies are considered persons against whom a § 1983 claim for damages will lie. *Will v. Michigan Dept. of State Police*, 491 U. S. 58, 65-66 (109 SC 2304, 105 LE2d 45) (1989).

[6] Because Pioneer RESA is considered a local governmental entity, it is precluded from asserting sovereign immunity as a defense to a § 1983 claim. See *Owen v. City of Independence*, 445 U. S. 622, 647-648 (III) (A) (100 SC 1398, 63 LE2d 673) (1980) ("By including municipalities within the class of 'persons' subject to liability for violations of the Federal Constitution and laws, Congress – the supreme sovereign on matters of federal law – abolished whatever vestige of the State's sovereign immunity the municipality possessed.").

Specifically, they argue that questions of material fact remain as to whether Pioneer RESA had an affirmative duty, under the due process clause of the Fourteenth Amendment, to prevent Jonathan from harming himself and that such questions also remain as to whether Pioneer RESA's conduct, policies, and employee training procedures demonstrated a deliberate indifference to that duty. We disagree.

In order to state a claim against Pioneer RESA under 42 USC § 1983, the Kings must allege that a Pioneer RESA policymaker's acts or omissions, done under color of state law, resulted in the deprivation of a right, privilege, or immunity protected by the United States Constitution or the laws of the United States. *Brown v. Dorsey*.[7] Put simply, a "plaintiff must show a deprivation of a federal right by a person acting under color of state law." (Punctuation omitted.) Id. In *Monell v. Dept. of Social Svcs. &c.*,[8] the United States Supreme Court held that municipalities and other local governmental entities are included among those persons to whom § 1983 applies. However, in that same decision, the Court also held that a local governmental entity may not be held liable on a respondeat superior theory, stating that "[i]nstead, it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, supra, 436 U. S. at 694 (II). See *Bd. of the County Commrs. &c. v. Brown*.[9] The Supreme Court has further held that a "proper analysis requires [a court] to separate two different issues when a § 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the [municipality] is responsible for that violation." *Collins v. City of Harker Heights*.[10] With this background in mind, we first address whether Jonathan's suicide was caused by a violation of his Fourteenth Amendment right to substantive due process. See *Rooney v. Watson*[11] ("an inquiry into a governmental entity's custom or policy is relevant only when a constitutional deprivation has occurred").

(a) *Jonathan's suicide was not caused by a deprivation of his substantive due process rights.* The Kings contend that Pioneer RESA had an affirmative duty, under the due process clause of the

---

[7] *Brown v. Dorsey*, 276 Ga. App. 851, 853 (625 SE2d 16) (2005).

[8] *Monell v. Dept. of Social Svcs. &c.*, 436 U. S. 658, 690 (II) (98 SC 2018, 56 LE2d 611) (1978).

[9] *Bd. of the County Commrs. &c. v. Brown*, 520 U. S. 397, 403 (II) (117 SC 1382, 137 LE2d 626) (1997).

[10] *Collins v. City of Harker Heights*, 503 U. S. 115, 120 (I) (112 SC 1061, 117 LE2d 261) (1992).

[11] *Rooney v. Watson*, 101 F3d 1378, 1381 (II) (11th Cir. 1996).

Fourteenth Amendment, to prevent Jonathan's suicide. "[T]he Due Process Clause was intended to prevent government officials from abusing their power, or employing it as an instrument of oppression." (Punctuation omitted.) *County of Sacramento v. Lewis*.[12] "The substantive component of the Due Process Clause protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." (Punctuation omitted.) *Davis v. Carter*.[13] See *Collins*, supra, 503 U. S. at 125 (III). However,

> nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security.

*DeShaney v. Winnebago County Dept. of Social Svcs.*[14]

In *DeShaney*, the Supreme Court "rejected the argument that a constitutional duty of protection can arise from a state's special relationship with a particular individual where the state played no part in creating the danger posed to the individual." (Punctuation omitted.) *Davis*, supra, 555 F3d at 982 (II). Specifically, the Court held that

> [i]n the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf — through incarceration, institutionalization, or other similar restraint of personal liberty — which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty against harms inflicted by other means.

*DeShaney*, supra, 489 U. S. at 200 (II). See *City of Revere v. Massachusetts Gen. Hosp.*[15] (applying substantive due process duty to protect to pre-trial detainees); *Youngberg v. Romeo*[16] (applying substantive due process duty to protect involuntarily-committed mental patients). Applying this analysis, the Eleventh Circuit Court of Appeals has found that, unlike incarceration or involuntary institu-

---

[12] *County of Sacramento v. Lewis*, 523 U. S. 833, 846 (II) (B) (118 SC 1708, 140 LE2d 1043) (1998).

[13] *Davis v. Carter*, 555 F3d 979, 981 (II) (11th Cir. 2009).

[14] *DeShaney v. Winnebago County Dept. of Social Svcs.*, 489 U. S. 189, 195 (II) (109 SC 998, 103 LE2d 249) (1989).

[15] *City of Revere v. Massachusetts Gen. Hosp.*, 463 U. S. 239, 244 (III) (B) (103 SC 2979, 77 LE2d 605) (1983).

[16] *Youngberg v. Romeo*, 457 U. S. 307, 315-316 (II) (A) (102 SC 2452, 73 LE2d 28) (1982).

tionalization, "[c]ompulsory school attendance laws alone are not a restraint of personal liberty sufficient to give rise to an affirmative duty of protection." (Punctuation omitted.) *Wyke v. Polk County School Bd.*[17] See *Vernonia School Dist. 47J v. Acton.*[18] In *Wyke*, the Eleventh Circuit held that

> [b]y mandating school attendance, the state simply does not restrict a student's liberty in the same sense that it does when it incarcerates prisoners or when it commits mental patients involuntarily. Absent that type of restraint, there can be no concomitant duty to provide for the student's safety and general well-being.

(Punctuation omitted.) *Wyke*, supra, 129 F3d at 569 (III) (A). See *Murphy v. Bajjani.*[19] Other circuits have similarly rejected the argument that compulsory school attendance saddles school authorities with a duty to protect students from private harms. See *Hasenfus v. LaJeunesse;*[20] *Armijo v. Wagon Mound Public Schools;*[21] *Dorothy J. v. Little Rock School Dist.;*[22] *D. R. v. Middle Bucks Area &c. School;*[23] *J. O. v. Alton Community Unit School Dist. 11.*[24] Thus, compulsory school attendance laws did not create a constitutional duty for Pioneer RESA to protect Jonathan from harming himself.

The Kings argue that confining Jonathan to the time-out room constituted a restraint on his liberty that was more analogous to that of an incarcerated inmate or an involuntarily-committed mental patient, and therefore Pioneer RESA had a duty to protect him. However, even if we accept the premise that sending Jonathan to the time-out room created a situation that was more analogous to that of an incarcerated inmate than to a middle-school student, the Kings' argument that Pioneer RESA deprived Jonathan of his right to substantive due process still fails. "To establish liability for a prisoner's suicide under section 1983, the plaintiff must show that the jail official displayed 'deliberate indifference' to the prisoner's taking of his own life." (Punctuation omitted.) *Gish v. Thomas.*[25]

---

[17] *Wyke v. Polk County School Bd.*, 129 F3d 560, 569 (III) (A) (11th Cir. 1997).

[18] *Vernonia School Dist. 47J v. Acton*, 515 U. S. 646, 655 (III) (115 SC 2386, 132 LE2d 564) (1995).

[19] *Murphy v. Bajjani*, 282 Ga. 197, 202-203 (3) (647 SE2d 54) (2007).

[20] *Hasenfus v. LaJeunesse*, 175 F3d 68, 71-72 (1st Cir. 1999).

[21] *Armijo v. Wagon Mound Public Schools*, 159 F3d 1253, 1261 (II) (a) (10th Cir. 1998).

[22] *Dorothy J. v. Little Rock School Dist.*, 7 F3d 729, 732 (II) (8th Cir. 1993).

[23] *D. R. v. Middle Bucks Area &c. School*, 972 F2d 1364, 1370 (IV) (A) (3rd Cir. 1992).

[24] *J. O. v. Alton Community Unit School Dist. 11*, 909 F2d 267, 272-273 (III) (A) (7th Cir. 1990).

[25] *Gish v. Thomas*, 516 F3d 952, 954 (III) (11th Cir. 2008).

YALE LAW LIBRARY

Specifically,

> [t]he plaintiff must prove that the official had *subjective* knowledge of a risk of serious harm and disregarded that risk by conduct that constituted more than mere negligence. Deliberate indifference requires that the defendant deliberately disregard a strong likelihood rather than a mere possibility that the self-infliction of harm will occur.

(Citation and punctuation omitted; emphasis supplied.) Id. See *Farmer v. Brennan.*[26] Furthermore,

> [t]o be deliberately indifferent to a strong likelihood that the prisoner will commit suicide, the official must be subjectively aware that the *combination* of the prisoner's suicidal tendencies and the feasibility of suicide in the context of the prisoner's surroundings creates a strong likelihood that the prisoner will commit suicide.

(Emphasis in original.) *Gish*, supra, 516 F3d at 954-955 (III).

Here, there is no evidence that the two Alpine employees who were responsible for putting Jonathan in the time-out room (Jackson and Trotter) on the day that he committed suicide acted with deliberate indifference. Both Trotter, who was working only his second day as a substitute paraprofessional at Alpine, and Jackson testified that they were not made aware by other staff that Jonathan had ever threatened to harm himself and did not know of any reason why he would do so. In fact, the Kings acknowledge that neither Jackson nor Trotter had been made aware of the alleged suicidal threats that Jonathan had made while confined to the time-out room a few weeks prior to his death. Thus, in sending Jonathan to the time-out room, neither Jackson nor Trotter deliberately disregarded a strong likelihood that Jonathan would harm himself. See *Gish*, supra, 516 F3d at 955 (III). Accordingly, even if we were to conclude that Jonathan's confinement created an affirmative duty for Pioneer RESA to protect him from harming himself, the Kings have not demonstrated that the two school officials actually responsible for that confinement deprived Jonathan of his substantive due process rights.

(b) *Pioneer RESA was not responsible for Jonathan's suicide.* The Kings also contend that Pioneer RESA's conduct, policies, and employee training procedures demonstrated a deliberate indiffer-

---

[26] *Farmer v. Brennan,* 511 U. S. 825, 835 (II) (B) (114 SC 1970, 128 LE2d 811) (1994).

ence to its duty to protect Jonathan from harming himself. This contention is without merit. As discussed in Division 1 (a), the Kings have failed to show that Jonathan was deprived of his right to substantive due process by any school officials. Without an underlying violation of Jonathan's constitutional rights, Pioneer RESA cannot be liable on the ground that its conduct, policies, or training procedures caused a constitutional violation. See *Collins*, supra, 503 U. S. at 120 (I); *City of Los Angeles v. Heller*;[27] *Gish*, supra, 516 F3d at 955 (III). Accordingly, the trial court did not err in granting summary judgment to Pioneer RESA as to the Kings' claims under 42 USC § 1983.

2. The Kings also contend that the trial court erred in granting DOE's motion to dismiss, arguing that the IDEA imposed a duty on DOE to regulate Alpine's use of the time-out rooms and thus that their claims against DOE are not barred by sovereign immunity. We disagree.

"We review de novo a trial court's ruling on a motion to dismiss based on sovereign immunity grounds, which is a matter of law. Factual findings are sustained if there is evidence supporting them, and the burden of proof is on the party seeking the waiver of immunity." (Citation omitted.) *Williams v. Ga. Dept. of Transp.*[28]

(a) *IDEA imposes no tort liability upon DOE.* In this matter, the Kings sued DOE for Jonathan's wrongful death, claiming that DOE was liable under OCGA § 50-21-23 (a). It is undisputed that no DOE officials or employees participated directly in sending Jonathan to the time-out room on the day that he committed suicide. In addition, the undisputed evidence shows that DOE never exercised any control or oversight over Alpine's use of its time-out rooms other than generally reviewing Alpine's policies to determine whether those policies were in compliance with the IDEA. Focusing on this compliance review, the Kings contend that the IDEA, 20 USC § 1400 et seq., imposed a duty upon DOE to regulate Alpine's use of its time-out rooms and that DOE's failure to do so constituted negligence on its part. This contention is belied by the language of the statute and relevant case law.

The IDEA was enacted, in part, "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs." 20 USC § 1400 (d) (1) (A). Toward this purpose, the IDEA authorizes federal financial assistance to states that agree to provide disabled children with special education and

---

[27] *City of Los Angeles v. Heller*, 475 U. S. 796, 799 (106 SC 1571, 89 LE2d 806) (1986).
[28] *Williams v. Ga. Dept. of Transp.*, 275 Ga. App. 88, 89 (1) (619 SE2d 763) (2005).

related services. See 20 USC § 1411. Under the act, DOE is responsible for general supervision over each local educational agency's compliance with the IDEA. See 20 USC § 1412 (a) (11). A local educational agency is eligible for assistance under the act for a fiscal year, if the agency submits a plan to DOE, assuring that it has met certain required conditions. See 20 USC § 1413 (a). Given the purpose and language of the IDEA, it is not surprising that the Eleventh Circuit Court of Appeals has held that "[a]lthough the IDEA is silent about the availability of tort-like damages, tort-like damages are simply inconsistent with the IDEA's statutory scheme." (Punctuation omitted.) *Ortega v. Bibb County School Dist.*[29] See *Sellers v. School Bd. &c.*[30] Specifically, the Court held that "the IDEA's primary purpose is to ensure a free appropriate public education, not to serve as a tort-like mechanism for compensating personal injury." (Punctuation omitted.) *Ortega*, supra, 397 F3d at 1325 (IV). The Eleventh Circuit's decision regarding this issue is in line with the decisions of its sister circuits. See *Nieves-Marquez v. Puerto Rico*;[31] *Gean v. Hattaway*;[32] *Witte v. Clark County School Dist.*;[33] *Charlie F. v. Bd. of Ed. &c.*;[34] *Heidemann v. Rother.*[35]

Citing *Gadsby v. Grasmick*,[36] the Kings nevertheless argue that the IDEA requires that each disabled child within DOE's jurisdiction is provided a free and appropriate public education. This truism, however, does not provide the Kings with a tort claim. Indeed, while the Fourth Circuit Court of Appeals in *Gadsby* found that the State's Department of Education was ultimately responsible for providing plaintiffs' child with such an education, the Court determined that the remedy for the State's failure was reimbursement of the costs expended by the plaintiffs on private schooling for their child. Id. at 953-954 (II) (B) (4). Tort-like damages were not part of the Court's consideration. Thus, the IDEA does not impose a duty upon DOE that would give rise to the tort claims that the Kings have alleged against the agency. See *Ortega*, supra, 397 F3d at 1325 (IV).

(b) *DOE has not waived its sovereign immunity.* In addition to the fact that no federal statute imposes an independent and affirmative duty upon DOE to regulate Alpine's time-out rooms, DOE's sovereign immunity shields it from liability from any State tort law

---

[29] *Ortega v. Bibb County School Dist.*, 397 F3d 1321, 1325 (IV) (11th Cir. 2005).

[30] *Sellers v. School Bd. &c.*, 141 F3d 524, 527 (II) (4th Cir. 1998).

[31] *Nieves-Marquez v. Puerto Rico*, 353 F3d 108, 125 (III) (B) (1st Cir. 2003).

[32] *Gean v. Hattaway*, 330 F3d 758, 774 (III) (F) (6th Cir. 2003).

[33] *Witte v. Clark County School Dist.*, 197 F3d 1271, 1275 (9th Cir. 1999).

[34] *Charlie F. v. Bd. of Ed. &c.*, 98 F3d 989, 991 (7th Cir. 1996).

[35] *Heidemann v. Rother*, 84 F3d 1021, 1033 (8th Cir. 1996).

[36] *Gadsby v. Grasmick*, 109 F3d 940, 952 (II) (B) (3) (4th Cir. 1997).

claims that could conceivably pertain to this matter. Sovereign immunity extends to the State, its agencies, and its departments unless specifically waived by an Act of the General Assembly. *Bruton v. Dept. of Human Resources.*[37] "The first limitation on the waiver of the state's sovereign immunity is that it applies only to torts of state officers and employees acting within the scope of their official duties or employment." (Punctuation omitted.) *Lewis v. Ga. Dept. of Human Resources.*[38] Furthermore, Georgia's Tort Claims Act provides for a limited waiver of sovereign immunity, but also sets forth exceptions to that waiver. *Bruton,* supra, 235 Ga. App. at 293. In this matter, at least two of those exceptions apply.

In this matter, the Kings contend that DOE was liable for Jonathan's death because it inadequately inspected Alpine's time-out rooms. Although DOE did inspect Alpine's time-out room logs during the course of its IDEA compliance review, that inspection did not render DOE liable for injuries related to use of such rooms. OCGA § 50-21-24 (8) provides:

> The state shall have no liability for losses resulting from [i]nspection powers or functions, including failure to make an inspection or making an inadequate or negligent inspection of any property other than property owned by the state to determine whether the property complies with or violates any law, regulation, code or ordinance or contains a hazard to health or safety[.]

We have previously held that "the phrase 'inspection powers and functions,' as used in [this] statute, refers to those inspection powers and functions undertaken by state officials in the performance of their official duties or employment. Such action comes within the scope of the exception, notwithstanding the source of the alleged duty to inspect." *Magueur v. Dept. of Transp.*[39] Given that the Alpine school is not a state-owned property, DOE did not waive its sovereign immunity when it inspected the logs for the school's time-out rooms. See *Lewis,* supra, 255 Ga. App. at 809.

Moreover, OCGA § 50-21-24 (5) provides: "The state shall have no liability for losses resulting from[ a]dministrative action or inaction of a legislative, quasi-legislative, judicial, or quasi-judicial nature[.]" As we have previously held "[t]he term 'quasi' means *as if* or *analogous to,* while 'legislative' refers to the *making of laws.* So the term 'quasi-legislative' as used in OCGA § 50-21-24 (5) refers to

---

[37] *Bruton v. Dept. of Human Resources,* 235 Ga. App. 291, 293 (509 SE2d 363) (1998).
[38] *Lewis v. Ga. Dept. of Human Resources,* 255 Ga. App. 805, 808 (567 SE2d 65) (2002).
[39] *Magueur v. Dept. of Transp.,* 248 Ga. App. 575, 578 (547 SE2d 304) (2001).

YALE LAW LIBRARY

administrative action that is analogous to the making of laws." (Emphasis in original.) *Dept. of Transp. v. Watts.*[40] The Kings argue that DOE is liable for Jonathan's death because it had a duty to impose regulations upon Alpine, which it failed to do. However, given that DOE has not waived its sovereign immunity with regard to any quasi-legislative action it undertakes, it stands to reason that it similarly cannot be held to have waived its immunity when it chooses to impose no administrative regulations whatsoever. Accordingly, the trial court did not err in granting DOE's motion to dismiss the Kings' claims against it.

*Judgment affirmed. Doyle, J., concurs. Adams, J., concurs specially.*

ADAMS, Judge, concurring specially.

I concur in the majority opinion but write to emphasize one aspect of this tragic case.

Even if placing Jonathan in the seclusion room could be seen as rising to that level of restraint of personal liberty, the Kings cannot show that the school acted with deliberate indifference to his needs because the specific risk at issue — his intent to commit suicide — had been assessed by the appropriate on-site psychologist, the person most responsible for suicide prevention at the school, and the Kings have not countered that assessment with expert testimony.

It is unchallenged that the associate director and acting school psychologist, Diana Henning, acting in her professional capacity, performed a suicide risk assessment on Jonathan in which she concluded that his suicidal statements were "learned behavior, . . . that it was an escape or an attention-getting technique," in essence, "empty threats." She concluded that Jonathan was an attention seeker, impulsive, and that he gained attention in negative ways — "he liked shock value." During her conversations with Jonathan, he did not give the indications that Henning had been trained to look for to show that he was a genuine and serious suicide risk: he never indicated that he had a plan to actually commit suicide, he did not show intent to do so, and he did not show emotional distress. Rather, he indicated that he would make comments about suicide in order to "get out of math class" because he did not like the teacher, or because he was bored. He also said that he was kidding. This behavior followed a pattern that had been ongoing for several years.

Henning's assessment was based on her own experience with Jonathan, numerous conversations with Jonathan, her consultations with psychiatrists about Jonathan, review of psychiatric hospital

---

[40] *Dept. of Transp. v. Watts*, 260 Ga. App. 905, 906 (581 SE2d 410) (2003).

reports and other third-party reports regarding Jonathan, conversations with the school staff, and conversations with Jonathan's mother, who indicated that she knew of his suicidal comments. Henning communicated this opinion to Jonathan's placement committee, to the school staff, and to Jonathan's mother. And she updated Jonathan's teacher on his status from time to time. In other words, it is undisputed that the person at the school qualified to do so, a psychologist with direct and extensive knowledge of Jonathan's behavior, had applied her professional judgment and concluded that Jonathan was not a suicide risk; and that opinion was disseminated throughout the school. Thus, even if Jackson and Trotter had full information about Jonathan's previous suicidal statements on November 15, 2004, they could not have been acting with deliberate disregard of a strong likelihood that Jonathan would harm himself because Henning's professional opinion was that there was no such risk, and they would have been entitled to rely on that opinion.

One may question Henning's judgment about Jonathan, especially in hindsight, but there is no expert testimony in the record doing so. In short, given Henning's opinion, the Kings cannot show that the school acted with deliberate indifference to Jonathan's threats of harming himself.

DECIDED NOVEMBER 5, 2009 —
RECONSIDERATION DENIED DECEMBER 10, 2009 — 

*Orr, Brown & Johnson, E. Wycliffe Orr, Sr., William E. Cannon III*, for appellants.

*Thurbert E. Baker, Attorney General, Jennifer L. Dalton, Robert C. Edwards, Assistant Attorneys General, Harben, Hartley & Hawkins, Phillip L. Hartley, Crim & Bassler, Harry W. Bassler*, for appellees.

*Jonathan Zimring, Dawn R. Smith*, amici curiae.